[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12623

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 29, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-00155-CV-ORL-28-GJK

T. W.,
a minor, by Tracy M. Wilson, his next
friend, mother and natural guardian,

                                        Plaintiff-Appellant,

versus

THE SCHOOL BOARD OF SEMINOLE COUNTY, FLORIDA,
a subdivision of the State of Florida,
KATHLEEN MARY GARRETT,
individually,
FLORIDA DEPARTMENT OF FINANCIAL SERVICES,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 29, 2010)

Before BARKETT, PRYOR and HILL, Circuit Judges.

PRYOR, Circuit Judge:

This appeal presents the questions whether a teacher violated a disabled student's constitutional right to be free from excessive corporal punishment or discriminated against the student solely by reason of his disability, in violation of a federal statute, when the teacher physically and verbally abused the student on several occasions. The student, T.W., was enrolled for several months in Kathleen Garrett's autism class at a middle school in Seminole County, Florida. On a few occasions, Garrett physically restrained T.W. in response to his disruptive conduct. Garrett also occasionally called T.W. names, provoked him, and used profanity around him. There is evidence that Garrett's actions aggravated T.W.'s developmental disability, but there is no evidence that Garrett caused T.W. to suffer any serious physical injuries. T.W., by and through his mother, complained that Garrett and the School Board of Seminole County violated his rights under the Due Process Clause of the Fourteenth Amendment, 42 U.S.C. § 1983, and that the School Board discriminated against him because of his disability in violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). The district court granted summary judgment in favor of Garrett and the School Board. Although the events that allegedly transpired in Garrett's classroom are troubling, we

2

conclude that T.W.'s complaint that Garrett and the School Board violated his constitutional and federal statutory rights fails as a matter of law. We affirm the summary judgment in favor of Garrett and the School Board.

## I. BACKGROUND

We divide our discussion of the background of this appeal in three parts. First, we discuss T.W.'s disability. Second, we discuss the incidents that gave rise to T.W.'s claims against Garrett and the School Board. Third, we discuss the procedural history of this appeal. Because this appeal is from a summary judgment, we construe all facts in the light most favorable to T.W. Peterson v. Baker, 504 F.3d 1331, 1336 (11th Cir. 2007).

### A. T.W.'s Disability

T.W. exhibited developmental and behavioral problems at an early age. T.W. was aggressive, threw temper tantrums, and was extremely sensitive to touch and noise. Professionals at the Kennedy Krieger Institute in Baltimore, Maryland, administered T.W.'s first formal psychiatric evaluation when he was five years old and diagnosed him with anxiety disorder. T.W. received psychiatric treatment from the Kennedy Krieger Institute for about a year and a half and later received treatment from Key Point Mental Health and Bayview Medical Center. Professionals at the Bayview Medical Center diagnosed T.W. with separation

3

anxiety disorder, major depressive disorder, dysthymic disorder, receptive expressive language disorder, and eventually with pervasive developmental disorder. T.W. is verbal, but his receptive and expressive communication abilities are impaired, as are his coping abilities and interpersonal relationship skills.

As a student with a disability, T.W. was eligible for and received special education services at the public schools he attended. School officials initially classified T.W. as a student with a speech and language impairment. The officials later reclassified T.W. as a student with an emotional disturbance, and then as a student with autism or pervasive developmental disorder. T.W. exhibited several behavioral problems at the schools he attended in Baltimore, and these problems became more severe when he started middle school. T.W. struggled to obey rules, participate in class activities, and complete his work. He was aggressive toward himself and others; pushed, growled, and bit; threatened to blow up the school and to report false allegations of staff abuse; cursed; climbed on objects inappropriately; and scratched his head excessively. Crisis intervention staff at the middle school T.W. attended in Baltimore physically restrained him and removed him from the classroom on several occasions.

### B. Incidents Leading to T.W.'s Complaint

When T.W. was fourteen years old, he and his mother moved from

4

Baltimore to Orlando, Florida, to escape his mother's abusive boyfriend. T.W. enrolled in the seventh grade at South Seminole Middle School in May 2004. T.W. was in Garrett's autism class from May 2004 until the end of that school year, and he returned to Garrett's class for the eighth grade in August 2004. T.W. was in Garrett's classroom in the afternoons; he spent the mornings in another teacher's classroom.

Two aides assisted Garrett in the classroom. The first, Jennifer Rodriguez, assisted Garrett during both the spring and fall of 2004. The second, Sabrina Mort, assisted Garrett during the fall of 2004.

When T.W. enrolled at South Seminole in 2004, Garrett had been an autism teacher at the school for about four years. Garrett previously had taught mentally disabled students at Indian Trails Middle School, another school in Seminole County, for seven or eight years. In 1999 and 2000, administrators at Indian Trails received four complaints that Garrett had mistreated her students. Administrators at Indian Trails investigated three of these complaints and concluded that there was insufficient evidence to warrant disciplinary action against Garrett. The Professional Standards Division of the School Board investigated the fourth complaint in conjunction with a local law enforcement agency, but the investigation was unable to substantiate the complaint. Administrators also

5

received complaints from parents that Garrett was "strict and rigid" and that she was aggressive in her tone and demeanor.

By March 2000, the executive director of middle schools for Seminole County was aware of "an escalating problem [of parental complaints] with Garrett." He advised the superintendent to transfer Garrett from Indian Trails to a different school in Seminole County. In June 2000, the School Board approved Garrett's transfer from Indian Trails to South Seminole. No one informed the principal of South Seminole about the complaints of abuse that had been lodged against Garrett at Indian Trails, and no one advised the principal to monitor Garrett for potential abuse.

Garrett engaged in a number of abusive behaviors while she was a teacher at South Seminole, several of which are relevant to this appeal. Garrett used profanity in her classroom daily and directed it at her students, including T.W. Garrett told T.W. that he stinks and called him lazy, an asshole, a pig, and a jerk. She frequently teased T.W. and agitated him until he became angry. Once, when Mort cautioned Garrett that she should "watch what she was saying because the kids could go home and tell the parents everything she said," Garrett responded that the students "were all stupid shits and dumb asses and they would . . . never go home and tell." Mort testified that, at least once a week, Garrett would "pick and

6

nag at [T.W.] until he would just get to the point where he just couldn't take it anymore." Garrett often restrained her students after doing something to upset or anger them.

Garrett had a reputation as a disciplinarian. She used physical force against several of her students, including T.W. Garrett spanked one student and hit another student on the back of the head multiple times after the students had urinated on themselves; she flicked a student's ears until they were "blood red"; she bent a student's thumb backwards until the student screamed; she raised her fists at a student; and she restrained several students in an inappropriate manner.

Garrett also failed to protect her students from harm. When one of Garrett's assistants tried to stop a student from repeatedly banging his head on the desk, Garrett said, "If the little shit wants to bang his head, let him bang his head." On several occasions, Garrett left a student in clothing soiled by urine and feces.

Garrett used physical force against T.W. on five separate occasions. T.W. was slightly over five feet tall and weighed about 150 pounds when these incidents occurred. Garrett was nearly six feet tall and weighed about 300 pounds. Garrett had completed two courses on physical restraint techniques and was certified in crisis prevention intervention.

The first incident occurred in the spring of 2004, only a few days after T.W.

had enrolled at South Seminole. Garrett said something to T.W. to provoke him, T.W. and Garrett argued, and T.W. became upset. Garrett told T.W. to go to the cool down room. T.W. refused, called Garrett "Michael Jackson," "a pervert," and "a child molester," and threatened to have Garrett arrested. Garrett left her seat and approached T.W. She put T.W. on the floor with his face to the ground, straddled him so that her pelvic area was on top of his buttocks, and pulled his arms behind his back. Garrett told T.W. that she would release him when he followed her commands. According to a witness, Rodriguez, Garrett's method of restraint was inappropriate. The entire incident lasted no more than five minutes, and T.W. did not suffer any physical injuries.

The second incident occurred during the fall of 2004. While T.W. was seated at a table, Garrett asked him to do something. Instead of complying with Garrett's request, T.W. rose from the table and walked away. Garrett attempted to restrain T.W. while he stood, but T.W. turned around and began swinging his hands at her. Garrett forced T.W. to the floor and pulled his right leg up against the back of his left leg. Garrett held T.W. in this position for two to three minutes. After T.W. calmed down, Garrett released him, and T.W. returned to the table. A witness, Mort, observed that "the strength that [Garrett] took [T.W.] down with . . . was hard," and "[t]hey both probably got hurt that day." Mort testified that it was

8

inappropriate for Garrett to pull T.W.'s leg up in that manner.

The third incident also occurred during the fall of 2004. T.W. started scratching an insect bite while he was in Garrett's classroom. Garrett asked him to stop, but he continued scratching. According to Mort, T.W. "kept digging and digging at it, scratching and scratching at it" until his skin became "red and raw looking." Garrett approached the table where T.W. was seated and pushed T.W.'s arms down to prevent him from scratching the bite. T.W. began "screaming and hollering and cussing." Garrett pulled T.W. up from his chair without sliding his chair away from the table, which caused T.W.'s legs to hit the edge of the table. Then Garrett forced T.W. against the table, held his arms behind his back, and placed her weight against his back to hold him in that position. Garrett held T.W. in that position for about three minutes, even though T.W. told Garrett more than once that she was hurting him. Garrett told T.W. that she would release him as soon as he agreed to do his work. True to her word, Garrett released T.W. when he told her he would return to his work. Instead of returning to his work, T.W. kept scratching the insect bite. Garrett told T.W. to go to the cool down room, but he refused.

Garrett then led T.W. into the cool down room and shut the door. When T.W. started "hollering," Garrett went into the cool down room with T.W. and shut

9

the door behind her. Mort heard T.W. scream, "leave me alone," "stop it," and "you're hurting me." She also heard furniture moving around inside the room. Garrett came out of the room and shut the door, and several minutes later T.W. came out of the room. His hair and clothing were disheveled, and he was yelling, "you hurt me," and "I hate you," at Garrett. He called Garrett a pervert and told her that he was going to ask his mother to report Garrett because Garrett "hurts people." After T.W. left the cool down room, he crawled underneath a table in the classroom and began growling. Eventually, Alexis Agosto, the vice principal of South Seminole, came to the classroom to help calm T.W. The next day, T.W.'s mother sent a note to school asking why Garrett had twisted T.W.'s arm and shoved him against the wall in the cool down room. Mort testified that she could not say that anything inappropriate occurred in the cool down room.

Rodriguez observed a fourth incident but could not recall exactly when it occurred or what caused it. While T.W. was standing, Garrett used one of her hands to pin both of T.W.'s hands behind his back and kept them there as she guided him to the cool down room. According to Rodriguez, it is inappropriate to pull a student's arms behind his back because "it can cause asphyxiation."

Mort observed a fifth incident during the fall of 2004. Garrett had placed T.W. in the cool down room and turned off the lights. Garrett sat in front of the

door to block the exit. After at least five minutes, Garrett opened the door. T.W. was mumbling when he came out of the cool down room, but he had calmed down. As T.W. came out of the room, Garrett stuck her foot out and tripped him, causing him to stumble. Mort testified that she believed Garrett intended to trip T.W., and that it was not an accident. There is no evidence that T.W. fell or was injured in this incident.

T.W.'s mother, Tracy Wilson, observed bruises on T.W.'s lower arms on two occasions. When she asked T.W. what caused the bruises, T.W. said that Garrett had hurt him. Wilson never sought medical treatment for the bruises, never confronted Garrett about the bruises, and never asked to observe Garrett's class.

T.W.'s behavior deteriorated because of his experience in Garrett's classroom. According to Wilson, T.W. had trouble sleeping, became stressed, developed trust issues and panic attacks, started "urinating all over the place," cried to and from school, and refused to close doors. Dr. Day, a psychologist retained by Wilson, concluded that Garrett's actions "aggravated [T.W.'s] developmental disability, increasing his anger, and decreasing his adaptive functioning." Dr. Day also opined that T.W.'s decision to drop out of school "can be directly traced back to his experiences with Ms. Garrett." Dr. Upchurch, another psychologist retained by Ms. Wilson, concluded that T.W. "was indeed traumatized and abused in the

11

school environment when he was under the care of . . . Garrett." Dr. Upchurch explained that "[t]he systemized application of harsh words and actions towards the students in the class and towards [T.W.] himself created an environment of danger and fear . . . ,which resulted in his exhibiting symptoms of Post Traumatic Stress Disorder." Because T.W. was "one of the higher functioning students in the class[,] . . . [h]is inability to protect the [other students] created a sense of guilt and powerlessness." Like Dr. Day, Dr. Upchurch concluded that T.W.'s "distress and inability to feel safe at school eventually caused [him] to drop out of school."

On Friday, October 22, 2004, Mort and Rodriguez met privately with the vice principal of South Seminole, Agosto, to express their concerns about Garrett's behavior in the classroom. Rodriguez never had expressed any concerns about Garrett's behavior to Agosto before this meeting, and Mort had mentioned to Agosto only in passing that Garrett "was being too rough with the kids."

Mort and Rodriguez decided to meet with Agosto because of an incident that had occurred the previous day. Garrett had used her full body weight to restrain a student on top of his desk and had held the student's head down so that his neck was against the edge of his desk, which caused his eyes to swell and his lips to turn blue. Agosto expressed Mort's and Rodriguez's concerns to the principal of South Seminole, Robin Dehlinger. The following Monday, Agosto and Dehlinger called

12

Florida's child abuse hotline to report the allegations, asked Garrett to leave the school grounds, and suspended her with pay.

Police arrested Garrett on charges of child abuse on November 10, 2004. Garrett resigned her teaching position two days later. Garrett was charged in a Florida court with five counts of child abuse based on allegations that Garrett abused four of T.W.'s classmates, but the state dropped one count at trial. The jury deliberated on two counts and returned a verdict of guilty on one count, but the court withheld adjudication.

After Garrett was suspended, an investigator for the Professional Standards Division seized the computers that were in Garrett's classroom and performed a forensic analysis. Mort and Rodriguez had alleged that Garrett engaged in masochistic or sadistic sexual behavior outside the classroom and that she may have used the computers to facilitate these encounters. The investigator discovered images on the hard drive of one of the computers of Garrett engaged in sexual acts that were masochistic or sadistic in nature. Dr. Danziger, a psychiatrist retained by T.W., opined that Garrett likely "suffered from both sexual masochism and sexual sadism." According to Dr. Danziger, Garrett's verbal and physical abuse of her students was "consistent with someone whose private sadistic sexual practices spilled over into the classroom setting."

13

## C. Procedural History

T.W., by his next friend, mother, and natural guardian, Tracy Wilson, filed a complaint against Garrett and the School Board. T.W.'s complaint asserted three claims. First, the complaint alleged that Garrett and the School Board violated his right under the Due Process Clause of the Fourteenth Amendment "to be free from unnecessary and unreasonable force or intentional, reckless or deliberately indifferent or oppressive conduct that causes emotional or psychological harm," 42 U.S.C. § 1983. Second, the complaint alleged that the School Board discriminated against T.W. on the basis of his disability, in violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). Third, the complaint alleged that the School Board negligently hired, supervised, or retained Garrett, in violation of Florida law.

Both Garrett and the School Board moved for a summary judgment against all claims. The district court granted the motions as to the federal claims and declined to exercise supplemental jurisdiction over the claim under Florida law, which was dismissed without prejudice. Because the district court concluded that the federal claims against Garrett failed as a matter of law, the district court did not decide whether Garrett was entitled to qualified immunity.

## II. STANDARD OF REVIEW

We review a summary judgment de novo, applying the same legal standard as the district court. Peterson, 504 F.3d at 1336. "Summary judgment is warranted only when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)). A dispute as to a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). In reviewing a summary judgment, we view all facts and draw all reasonable inferences from those facts in favor of the nonmoving party. Peterson, 504 F.3d at 1336.

## III. DISCUSSION

We divide our discussion of this appeal in two parts. We first discuss whether a reasonable jury could conclude that Garrett or the School Board violated T.W.'s right to due process under the Fourteenth Amendment. We then discuss whether a reasonable jury could conclude that the School Board discriminated against T.W. solely by reason of his disability, in violation of section 504 of the Rehabilitation Act.

*A. Substantive Due Process*

The Due Process Clause protects individuals against arbitrary exercises of government power, but "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" County of Sacramento v. Lewis, 523 U.S. 833, 845–46, 118 S. Ct. 1708, 1716 (1998) (quoting Collins v. City of Harker Heights, 503 U.S. 115, 129, 112 S. Ct. 1061, 1071 (1992)).  To be arbitrary in the constitutional sense, an executive abuse of power must "shock[] the conscience." Id. at 846, 118 S. Ct. at 1717.  "[T]he constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." Id. at 848, 118 S. Ct. at 1717.  The Due Process Clause does not "impos[e] liability whenever someone cloaked with state authority causes harm." Id.  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. at 849, 118 S. Ct. at 1718.  Both this Court and the Supreme Court have "said repeatedly that the Fourteenth Amendment is not a 'font of tort law' that can be used, through section 1983, to convert state tort claims into federal causes of action." Neal ex rel. Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1074 (11th Cir. 2000); see also Lewis, 523 U.S. at 848, 118 S. Ct. at

16

1718. Nevertheless, "excessive corporal punishment, at least where not administered in conformity with a valid school policy authorizing corporal punishment . . . may be actionable under the Due Process Clause when it is tantamount to arbitrary, egregious, and conscience-shocking behavior." Neal, 229 F.3d at 1075.

As a threshold matter, we must address T.W.'s contention that Garrett's actions do not constitute corporal punishment because our resolution of this issue "dictates the kind of analysis we must adopt for [his] claim." Id. at 1072. T.W. asserts that evidence that Garrett verbally abused her students, physically abused students other than T.W., and engaged in sadistic sexual behavior supports an inference that Garrett restrained T.W. out of malice and sadism, not for the purpose of discipline. "Not all corporal punishment cases arise under . . . circumstances" where "school officials, subject to an official policy or in a more formal disciplinary setting, mete out spankings or paddlings to a disruptive student." Id. Many "involve less traditional, more informally-administered, and more severe punishments." Id. The key inquiry is not what form the use of force takes but whether the use of force is "related to [the student's] misconduct at school and . . . for the purpose of discipline." Id. at 1073; see also Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 173–74 (3d Cir. 2001).

17

The evidence overwhelmingly establishes that Garrett's use of force during the first four incidents was related to T.W.'s disruptive or self-injurious conduct and was for the purpose of discipline. Garrett's intent to discipline T.W. during the first incident is evidenced by her statement to T.W. that she would release him when he followed her instructions. Garrett's intent to discipline T.W. during the second incident is evidenced by Mort's testimony that Garrett released T.W. as soon as T.W. calmed down. Garrett's intent to discipline T.W. during the third incident is evidenced by Garrett's statement to T.W. that she would release him when he agreed to do his work, and by Mort's testimony that Garrett did release T.W. when he agreed to comply with her instructions. Garrett's intent to discipline T.W. during the fourth incident is evidenced by Rodriguez's testimony that Garrett restrained T.W. while she guided him to the cool down room.

With respect to the fifth incident, when Garrett tripped T.W. as he left the cool down room, the evidence supports a reasonable inference that Garrett's use of force was unrelated to T.W.'s disruptive behavior and lacked a disciplinary purpose. This Court has yet to articulate the analysis that applies when a school official's use of force does not constitute corporal punishment. T.W. contends that we should perform an analysis that is different from the analysis we perform for corporal punishment, but he never explains that alternative analysis, and he

18

acknowledges that "it is clear that the 'shocks the conscience' standard is applicable" because he brought his claim under the Fourteenth Amendment. Our decisions involving complaints of excessive force filed by pre-trial detainees instruct that a government official's use of force violates the Fourteenth Amendment only if it shocks the conscience. See, e.g., Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009). We need not determine the precise analysis we should employ in evaluating whether the use of force by a school official rises to that level because, under any analysis, it is inconceivable that tripping a student and causing the student to stumble, without more, violates the Constitution. "A range of teacher conduct exists that is neither corporal punishment nor so conscience-shocking as to trigger a substantive due process violation." Peterson, 504 F.3d at 1337 n.4. The tripping incident falls within that range. We next consider whether Garrett's use of force during the first four incidents violated T.W.'s right to be free from excessive corporal punishment.

T.W.'s claim of excessive corporal punishment has "an objective and a subjective component, both of which must be met before a school official may be subject to liability." Neal, 229 F.3d at 1075 n.3. The evidence must support a reasonable inference that the punishment is "obviously excessive" as an objective matter and that Garrett "subjectively intend[ed] to use that obviously excessive

19

amount of force in circumstances where it was foreseeable that serious bodily injury could result." Id. To determine whether a use of force is "obviously excessive, we consider the totality of the circumstances." Id. at 1075. Three factors are particularly relevant: "(1) the need for the application of corporal punishment, (2) the relationship between the need and amount of punishment administered, and (3) the extent of the injury inflicted." Id. Because Neal instructs us to consider the totality of the circumstances, we also take into account T.W.'s disability.

We first consider the need for Garrett's use of force against T.W. Even Garrett acknowledged in her deposition that a teacher should use physical force against an autistic student only as a last resort. In considering whether there was a need to use force, we do not express any judgment as to the desirability of corporal punishment as a policy matter. Instead, we look at the circumstances surrounding Garrett's use of force to determine whether the force is "capable of being construed as an attempt to serve pedagogical objectives." Gottlieb, 272 F.3d at 174.

The evidence establishes that Garrett's use of force against T.W. "is capable of being construed as an attempt" to restore order, maintain discipline, or protect T.W. from self-injurious behavior. Id. During the first incident, Garrett restrained T.W. only after he refused to go to the cool down room, called Garrett names, and

20

threatened to have her arrested. During the second incident, Garrett restrained T.W. after he refused to follow her instructions and swung his hands at her. During the third incident, Garrett restrained T.W. after he refused to stop scratching an insect bite that was "red and raw looking." There is no evidence as to what prompted Garrett to pin T.W.'s arms behind his back during the fourth incident, but the restraint occurred while Garrett was leading T.W. to the cool down room, which suggests that the restraint served some pedagogical objective.

T.W. contends that the need for Garrett's use of force was "non-existent" because Garrett provoked him to misbehave. Although there is evidence that Garrett frequently teased T.W. and agitated him until he became angry, there is scant evidence that Garrett provoked T.W. to disrupt class during the four incidents described above. The only evidence in this regard is Rodriguez's testimony that Garrett said something to provoke an argument with T.W. during the first incident, but Rodriguez explained that Garrett had angered T.W. by telling him that he should expect a different teaching style in her classroom. This evidence does not support a reasonable inference that Garrett provoked T.W. to misbehave so that she could restrain him.

T.W. also contends that evidence that Garrett verbally abused her students, physically abused students other than T.W., and engaged in sadistic sexual

behavior establishes that Garrett acted out of malice and sadism and lacked a legitimate justification to use force, but the objective component of T.W.'s excessive force claim does not concern the "subjective intent of the school official." Peterson, 504 F.3d at 1337 n.5. "[I]f the use of force was objectively reasonable—that is, if it 'was not excessive as a matter of law and was a reasonable response to the student's misconduct'—then the subjective intent of the school official is unimportant." Id. (quoting Wise v. Pea Ridge Sch. Dist., 855 F.2d 560, 563 n.4 (8th Cir. 1988)). Consequently, evidence as to Garrett's subjective intent does not affect our determination of whether, viewed objectively, the circumstances provided Garrett with a reason to use force. We conclude that during each of the four incidents when Garrett restrained T.W. there was at least "some reason . . . for [Garrett's] use of force." Id. at 1338. Although Garrett may have resorted to physical force too soon or when alternative disciplinary methods would have sufficed, we cannot say that Garrett's use of force was "wholly unjustified by a government interest." Id. at 1336.

We next consider the relationship between the need for the use of force and the amount of force administered. With respect to the four incidents involving restraints, the evidence establishes that Garrett restrained T.W. inappropriately. The straddling technique Garrett employed during the first incident was

22

inappropriate. Garrett "took [T.W.] down . . . hard" during the second incident and pulled T.W.'s leg up in an inappropriate manner. Garrett caused T.W.'s legs to hit the edge of the table during the third incident, when she pulled T.W. up from his chair without sliding it away from the table. The technique Garrett employed during the fourth incident to pin T.W.'s arms behind his back was dangerous because it can cause asphyxiation. On the other hand, the evidence also establishes that Garrett restrained T.W. only until he calmed down or agreed to comply with her instructions, and each incident lasted, at most, several minutes. Garrett told T.W. during the first incident that she would release him when he agreed to follow her commands. Garrett released T.W. from the restraint she imposed during the second incident when T.W. became calm. Similarly, Garrett released T.W. from the restraint she imposed during the third incident when T.W. agreed to complete his work. Although T.W. has presented evidence that Garrett could have restrained T.W. in a less harmful manner, "the amount of force at issue here was [not] totally unrelated" to the need for the use of force. Id. at 1337.

Finally, we consider the extent of T.W.'s injuries. Though the "extent and nature of the injury" is only one factor in our analysis, it is an important factor. See Neal, 229 F.3d at 1076. For example, this Court concluded that choking a student until he lost his breath and sustained blue and red bruises and a scratch on

23

his neck was not obviously excessive because "the extent of the student's bodily injury was not serious." Peterson, 504 F.3d at 1334–35, 1337. By contrast, hitting a student in the eye with a metal weight lock, permanently destroying the eye, was obviously excessive, Neal, 229 F.3d at 1076, as was striking a student with a metal cane on the head, ribs, and back with sufficient force to cause a large knot and continuing migraine headaches, Kirkland ex rel. Jones v. Greene County Bd. of Educ., 347 F.3d 903, 904 (11th Cir. 2003).

T.W. suffered only minor physical injuries. His mother saw bruises, but there is no evidence that T.W. experienced anything more than transient pain as a result of Garrett's restraints, and T.W. never received medical treatment for any physical injuries. See Peterson, 504 F.3d at 1337.

Unlike the plaintiffs whose claims we considered in Neal, Peterson, and Kirkland, T.W. presents evidence of psychological injury. Viewed in the light most favorable to T.W., this evidence establishes that Garrett's conduct aggravated T.W.'s developmental disability, exacerbated his behavioral problems, and caused symptoms of post traumatic stress disorder. This Court has never considered whether corporal punishment that causes only psychological injuries can amount to a violation of substantive due process. We are mindful that students like T.W., who suffer from severe developmental disabilities, are particularly vulnerable to

24

psychological harm, and that psychological injuries can be as traumatic, if not more traumatic, than physical injuries. It is clear that "[p]laintiffs have not fared well where psychological damage forms either the sole basis of or is an element of the plaintiff's substantive due process claim," Dockery v. Barnett, 167 F. Supp. 2d 597, 603 (S.D.N.Y. 2001), but we can imagine a case where an exercise of corporal punishment—even one that causes only psychological injury—"might be so severe that it would amount to torture equal to or greater than the stomach pumping abuse condemned in Rochin," Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist., 77 F.3d 1253, 1258 (10th Cir. 1996); see also Rochin v. California, 342 U.S. 165, 72 S. Ct. 205 (1952).

We need not decide whether corporal punishment that causes only psychological harm is categorically below the constitutional threshold. After considering the totality of the circumstances, including T.W.'s psychological injuries, we conclude that Garrett's conduct was not so arbitrary and egregious as to support a complaint of a violation of substantive due process. We do not condone the use of force against a vulnerable student on several occasions over a period of months, but no reasonable jury could conclude that Garrett's use of force was obviously excessive in the constitutional sense. Peterson, 504 F.3d at 1336–38; see also Brown ex rel. Brown v. Ramsey, 121 F. Supp. 2d 911, 923–25

25

(E.D. Va. 2000). Because Garrett's use of force was not obviously excessive, we need not consider whether the force Garrett used presented a reasonably foreseeable risk of serious bodily injury. Peterson, 504 F.3d at 1338 n.6.

Our decision "comports with the Supreme Court's mandate to remain vigilant in policing the boundaries separating tort law from constitutional law." Nix v. Franklin County Sch. Dist., 311 F.3d 1373, 1379 (11th Cir. 2002). Although the circumstances that gave rise to T.W.'s claim are truly unfortunate, the Due Process Clause imposes liability only in "extraordinary circumstances." Id. We disapprove of Garrett's alleged actions in no uncertain terms, and we are sympathetic to the harm that T.W. and his classmates suffered as a result of Garrett's misconduct. Nevertheless, we cannot say that the exercises of corporal punishment and force in this appeal are "'so brutal, demeaning and harmful as literally to shock the conscience of the court.'" Neal, 229 F.3d at 1075 (quoting Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980)).

The dissent makes much of collateral evidence that parents at Indian Trails lodged complaints against Garrett, that Garrett verbally and physically abused T.W.'s classmates at South Seminole, and that Garrett bullied her aides and her fellow teachers. This evidence undoubtedly paints Garrett in a negative light, but it does not support a conclusion that Garrett's use of force against T.W. was

26

obviously excessive. T.W. seeks to hold Garrett liable only for the harm she caused him, not his classmates or Garrett's students at Indian Trails. Many of T.W.'s classmates filed their own complaints against Garrett, and the same district court that granted Garrett's motion for summary judgment as to T.W.'s claims has permitted several of those complaints to proceed. See, e.g., M.S. ex rel. Soltys v. Seminole County Sch. Bd., 636 F. Supp. 2d 1317, 1326 (M.D. Fla. 2009) (denying Garrett's motion for summary judgment where complaint alleged that Garrett slammed a mentally retarded and severely autistic student against a desk and pushed his head down against the desk until his lips turned purple, among other incidents).

The dissent accuses us of ignoring or discounting evidence that suggests that Garrett knew her conduct was inappropriate and that Garrett acted with malice, but Garrett's state of mind is wholly irrelevant to our inquiry under the objective component of Neal. As we explained in Peterson, "if the use of force was . . . not excessive as a matter of law and was a reasonable response to the student's misconduct—then the subjective intent of the school official is unimportant." 504 F.3d at 1337 n.5 (internal quotation marks omitted); see also Neal, 229 F.3d at 1075 n.3; Wise, 855 F.2d at 563 n.4 (explaining that, if the force was not excessive as a matter of law, "the intent of the one who administers the punishment is

27

irrelevant"). Because we determined that Garrett's conduct was not obviously excessive, we need not ask whether Garrett was aware that her use of force was inappropriate or whether she intended to harm T.W.

The dissent also accuses us of ignoring or discounting evidence related to Garrett's use of force against T.W., but we have carefully considered the circumstances surrounding each use of force and evaluated those incidents individually and collectively. Unlike the dissent, however, in determining whether Garrett's conduct was so brutal and inhumane as to amount to a constitutional violation, we have remained mindful that the Due Process Clause does not "impos[e] liability whenever someone cloaked with state authority causes harm." Lewis, 523 U.S. at 848, 118 S. Ct. at 1717. Even viewing all the evidence in the light most favorable to T.W. and drawing all reasonable inferences in his favor, T.W.'s claim against Garrett fails as a matter of law because Garrett's conduct is not the kind of "arbitrary, egregious, and conscience-shocking behavior" that is actionable under the Constitution. Neal, 229 F.3d at 1075. We do not suggest, as the dissent contends we do, that any disciplinary act undertaken by a teacher is per se reasonable. Nor could we, in the light of precedents such as Neal. We conclude instead that Garrett's actions against T.W. do not rise to the exacting standard required under the Due Process Clause.

28

We also reject T.W.'s contention that his claim against Garrett should survive summary judgment because a genuine issue of material fact exists as to whether Garrett sexually abused him. The district court rejected this argument because T.W. had never alleged sexual abuse in his complaint and had failed to present evidence that would support a reasonable inference that sexual abuse occurred. We agree with the district court. The only evidence T.W. offers in support of his allegations of sexual abuse is speculative, and no reasonable jury could conclude that Garrett sexually abused T.W. on the basis of this evidence.

The district court also correctly granted summary judgment against T.W.'s claim under section 1983 against the School Board. "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). Because no reasonable jury could conclude that Garrett violated T.W.'s constitutional rights, T.W.'s dependent claim against the School Board fails too.

### B. Section 504 of the Rehabilitation Act

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or

29

his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The only issue on appeal is whether the School Board subjected T.W. to discrimination "solely by reason of . . . his disability." Id. To succeed on his discrimination claim under section 504, T.W. must prove, by a preponderance of the evidence, "that the [School Board] intended to discriminate against him on the basis of his disability." Berg v. Fla. Dep't of Labor & Employment Sec., 163 F.3d 1251, 1255 (11th Cir. 1998).

T.W. advances two distinct theories of liability under section 504. First, he asserts that the School Board itself intentionally discriminated against him when it "place[d] a teacher with a proclivity toward abuse with students who would not complain." Second, he asserts that Garrett intentionally discriminated against him and the School Board is liable for Garrett's misconduct under the theory of respondeat superior. We address each theory of liability in turn, and we conclude that T.W.'s claim under the Rehabilitation Act fails as a matter of law under either theory.

First, no reasonable jury could conclude that the School Board itself intentionally discriminated against T.W. on the basis of his disability. This Court has not decided whether to evaluate claims of intentional discrimination under

30

section 504 under a standard of deliberate indifference or a more stringent standard of discriminatory animus, see Wood v. President & Trs. of Spring Hill Coll., 978 F.2d 1214, 1218–20 (11th Cir. 1992), but we need not resolve that question in this appeal because T.W.'s claim fails as a matter of law under either standard. Under the more lenient standard of deliberate indifference, a plaintiff must prove that the defendant knew that harm to a federally protected right was substantially likely and that the defendant failed to act on that likelihood. Duvall v. County of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001). The record establishes that school administrators or the Professional Standards Division of the School Board investigated all complaints of abuse that parents lodged against Garrett and that they were unable to substantiate the complaints. Because it investigated the complaints and was unable to substantiate them, the School Board did not know that it was substantially likely that a violation of federally protected rights would occur. See Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987). Although evidence that the School Board applied its policies or rules unevenly with respect to disabled students would constitute circumstantial evidence of intentional discrimination, there is no such evidence here. See Berg, 163 F.3d at 1255.

Second, we consider whether the School Board is liable for Garrett's misconduct under a theory of respondeat superior. Although this Court has yet to

31

decide whether the Rehabilitation Act permits respondeat superior liability, we have held that its companion statute, the Americans with Disabilities Act, permits an employer to be held liable for the actions of its agents. Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996). This Court "rel[ies] on cases construing [the Rehabilitation Act and the Americans with Disabilities Act] interchangeably" because "the same standards govern discrimination claims" under both statutes. Allmond v. Akal Sec., Inc., 558 F.3d 1312, 1316 n.3 (11th Cir. 2009).

Even assuming that the Rehabilitation Act, like the Americans with Disabilities Act, permits the School Board to be held vicariously liable for Garrett's actions, T.W.'s claim fails because no reasonable jury could conclude that Garrett intentionally discriminated against T.W. solely by reason of his disability. Although there is evidence that Garrett harbored animosity for T.W. and other students entrusted to her care, that evidence does not support a reasonable inference that Garrett abused T.W. solely because of his disability. See Schwarz v. City of Treasure Island, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008). In all but the tripping incident, the evidence overwhelmingly establishes that Garrett restrained T.W. because he engaged in disruptive or self-injurious behavior. With respect to the tripping incident, even if the evidence supports an inference that Garrett tripped T.W. solely because of his disability, no reasonable jury could

32

conclude that this isolated incident deprived T.W. of his right to equal educational opportunity. See Berg, 163 F.3d at 1257 (noting that section 504 provides "the right to enjoy access . . . as if he were non-disabled"). T.W.'s claim against the School Board under section 504 of the Rehabilitation Act fails as a matter of law.

## IV.  CONCLUSION

We **AFFIRM** the summary judgment in favor of Garrett and the School Board.

BARKETT, Circuit Judge, dissenting:

There is no dispute that a student's right to be free from gratuitous violence or from excessive corporal punishment inflicted by teachers at public schools is protected by substantive due process under the Fourteenth Amendment. A claim alleging an infringement of this right requires a showing that the state conduct "can properly be characterized as arbitrary, or conscience shocking in a constitutional sense." Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1074 (11th Cir. 2000) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998) (quotation marks omitted)). I believe that this record, when considered in its totality and viewed in the light most favorable to T.W., more than adequately supports a conclusion that Garrett's repeated physical restraints and excessive force against T.W. "shocks the conscience" and thus violated his constitutional rights.[1]

In determining whether such a constitutional violation has occurred, we must be mindful that this right is rooted in the broader and fundamental liberty interest in bodily integrity. Indeed, "[n]o right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his

---

[1] This record supports a finding that T.W.'s rights under both the Due Process Clause and under the Rehabilitation Act were violated. Although the legal tests for these two claims differ, the same facts that would support a reasonable jury's finding that Garrett's conduct was sufficiently "conscience-shocking" to violate T.W.'s substantive due process rights also could support a finding, under the Rehabilitation Act, that the Board, which through *respondeat superior* is liable for Garrett's conduct, intentionally discriminated against T.W. due to his disability.

own person, free from all restraint or interference from others, unless by clear and unquestionable authority of law." Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 251 (1891). Upon this record, as explained below, a reasonable jury could find that Garrett's restraints, use of force, and conduct constituted abuse of T.W. for more than a year for behavior that was expected, normal, and uncontrollable for a developmentally disabled child. The jury could find that Garrett's conduct did not consist of one or two isolated incidents of misplaced zeal but, rather, was a pattern of abuse and harassment that occurred over the school year and was motivated, not by legitimate pedagogical reasons, but by malice and/or sadism. The record could support a finding that Garrett indulged her desire to control and dominate her developmentally disabled students by exploiting their vulnerabilities, despite knowing it would cause them significant emotional, physical, and developmental harm. Finally, the record could support a finding that Garrett threatened and intimidated her classroom aides and another teacher to prevent them from reporting her conduct. Accordingly, because there are disputed issues of material fact from which a jury could conclude that the manner in which Garrett treated T.W. shocks the conscience, I dissent from the majority's affirmance of summary judgment.[2]

---

[2] Other courts, including one confronting claims against Garrett by another student, have denied motions for summary judgment in cases in which the defendant teachers were alleged to have similarly used unnecessary, unjustified, and excessive force against their autistic and otherwise developmentally disabled students. Those courts reasoned that these uniquely fact-

## I.

In addition to the facts recounted by the majority, the record contains additional evidence the majority discounts or does not mention that, when properly considered, presents genuine disputes of material facts that must be resolved by a jury. These factual issues concern both the specific incidents of Garrett's use of force and the context in which they occurred. The record contains evidence that Garrett knew, through her training and experience, that her use of force and other classroom conduct violated both school policy and the professional standards of managing developmentally disabled students. There is also record evidence that Garrett deliberately ignored and violated these official mandates, sufficient to support an inference that her use of force was not motivated by any legitimate pedagogical reason, but instead was driven by malice and sadism.

### A. Garrett's Training, Experience, and Classroom Demeanor

First, the majority fails to consider the evidence that Garrett knew that restraining and using force on T.W. was inappropriate. Garrett herself testified that she knew that corporal punishment of <u>any</u> kind, including spanking, hitting, kicking, biting, and throwing students, was specifically prohibited by the School

---

and credibility-specific determinations must be resolved by a jury. <u>See, e.g.</u>, <u>M.S. v. Seminole County Sch. Bd.</u>, 636 F. Supp. 2d 1317, 1324 (M.D. Fla. 2009) (Antoon, J.); <u>Dockery v. Barnett</u>, 167 F. Supp. 2d. 597, 604 (S.D.N.Y. 2001).

36

Board in <u>any</u> circumstance. She also knew that if she needed help with a student's behavioral problems, there were certified behavior analysts in the county who were always available.

Significantly for our purposes, Garrett testified that she knew from her training[3] that positive reinforcement in the form of "redirecting" T.W. to focus on another task when he acted "off-task"[4] (i.e. when he deviated from what he had been asked to do, as a result of his disability) was the appropriate response. Garrett testified that she knew from her education and experience with autistic children that a teacher's use of force should be an "absolute last resort," and that hitting a child to stop an off-task behavior would <u>always</u> be wrong.

Despite being trained on the appropriate methods for managing the behavior of autistic students, evidence indicates that Garrett consistently ignored these dictates to her students' detriment. According to this record, the School Board was aware that Garrett's tenure at Indian Trails School, prior to being assigned to

---

[3] Garrett's college degree was for teaching "exceptional students" like T.W., who were emotionally disturbed, had autistic tendencies, and other developmental disabilities. She was certified to teach mentally handicapped children. She took supplemental classes from numerous sources that focused on working with autistic and developmentally disabled students, specifically covering behavior management techniques for autistic students.

[4] What is considered "off-task" behavior depends on the autistic child himself; it is physical actions that the child engages in that are uncontrollable, repetitive at times, and may be brought on and exacerbated by stressful situations. Such conduct may include: "[l]ooking around the room, throwing their task across the room, getting up and walking around," flapping their arms, yelling or blurting out speech. These are similar to the behaviors that T.W. displayed in her classroom.

SSMS, T.W.'s school, was characterized by allegations of her use of excessive force by multiple parents of special needs children, similar to T.W.'s claims. The record contains evidence that: (1) one child was diagnosed with post-traumatic stress disorder after Garrett grabbed the child by the hair and slammed her face against the desk with sufficient force to cause her glasses to fly off; (2) another child was left in his soiled pants for so long that his buttocks had become raw and were bleeding; (3) another child suffered a broken nose and chipped teeth while in Garrett's care; and (4) another child, who was non-communicative and disabled, was hit three times in the head with a meter stick by Garrett.

Garrett was subsequently transferred to SSMS where she was hired to teach developmentally disabled students. As part of her preparation,[5] Garrett knew that T.W.'s disability manifested itself in several specific behaviors that were expected, normal, and uncontrollable for him. Specifically, T.W.'s psychological assessment indicated that, as a result of his autism and pervasive developmental disorder, he exhibited "disruptive and aggressive behavior at times" including "attempt[ing] to leave his classroom without permission, pretend[ing] to be a dinosaur by growling and pretending his fingers are claws, and using foul and abusive language . . . . In

_____

[5] Garrett testified that to prepare for her position at SSMS, she reviewed her students' files and prior behavior plans, and spoke to the parents and prior teachers at individual education plan meetings.

38

addition, [he] occasionally attempts to harm himself by banging his head against walls, scratching a scab until it bleeds, or climbing on furniture." This assessment also noted that T.W. displayed "defiance . . . a refusal to comply with adults' requests . . . frequent temper outbursts . . . restlessness, a tendency to be 'on the go' and leave his seat, difficulty waiting his turn . . . excitability . . . distractability, a short attention span, a lack of interest in schoolwork, a failure to finish things he starts, and a failure to follow through on instructions."

In light of these known symptoms, which were characteristic of T.W.'s disabilities, **the assessment warns and reiterates at multiple points that physical contact with T.W. was to be avoided at all costs due to the harm that it would cause him.**[6] Further, Garrett concedes that she knew from her training and experience and T.W.'s assessment that physical contact of <u>any</u> kind was an inappropriate method of redirecting T.W.'s attention and would have the

_____

[6] The assessment emphasizes and reiterates at multiple points that T.W. has a "rigid spatial boundary . . . [he] is upset when touched, has poor contact, and demonstrates poor manners . . . is easily upset by changes in routine, often engaging in temper tantrums when subjected to change." Because of T.W.'s strong aversion to physical touch, the few instances in which T.W. had been restrained prior to becoming a student of Garrett's were "particularly upsetting for [him]." T.W.'s behavior worsens if there is physical contact or over-stimulation (including loud noises). Thus, teaching staff working with T.W. were cautioned to "avoid physical contact <u>unless absolutely necessary</u> such as when [T.W.] is engaging in unsafe behaviors, <u>not make instigating comments</u>, and identify when loud noises, changes in routine, or other over-stimulating activities are having a detrimental effect on [T.W.]'s behavior and appropriately signal his desire to leave the room and complete his work individually with his personal assistant." (emphasis added).

39

undesirable effect of escalating the situation.

Second, the majority fails to consider a significant amount of conflicting record evidence about Garrett's conduct in the classroom at SSMS that, when viewed in T.W.'s favor, provides relevant context from which a reasonable jury could find that Garrett's use of excessive force was malicious because no force was necessary. In particular, the aides in Garrett's classroom testified extensively about the environment Garrett created in her classroom. Although Garrett testified that she would not physically restrain autistic students to stop their behavior because "it's something I wouldn't do" and because she knew "it would be an improper technique," the aides in Garrett's classroom testified that she would deliberately provoke T.W. (and her other special needs students) "all the time," to get him (and them) to misbehave so that she could then restrain him, and "show him who is boss."

Based upon what she observed firsthand, Jennifer Rodriguez, one of the classroom aides, testified that Garrett seemed to enjoy inflicting pain. Lynn Tacher, another teacher of special needs children at the same school, testified that she "could regularly hear [Garrett] yelling at [her] students [and] . . . could regularly hear the autistic children in [her] class crying and screaming while in the [cooldown room]." On a daily basis, Garrett would yell profanities across the

40

classroom and direct profanity at the children, intimidating them by repeatedly telling them to "shut the fuck up," though Garrett "used just about every word there is." The record contains testimony that Garrett used force on other students in her class by: (1) elbowing them in the face; (2) picking a student up by the arm, jerking him out of his seat and throwing him across the room until he hit the cabinets against the wall; 3) flicking another student's ears, with her acrylic nails, and failing to stop even when the ears were "blood red;" and (4) after being pinched by a student, placing that student on his desk, putting his arm behind his back and laying her body down on his with his neck against the edge of the desk. Sabrina Mort, another classroom aide, testified that the child's "lips were turning purple, and his eyes were bulging out," which "really" scared Mort because he was "very small framed" so she pulled Garrett off him. Garrett then became angry, saying "that this was her class, and she could run it whatever the fucking way she felt."

Mort further testified that Garrett told her that she could hit the children because "they were all stupid shits and dumb asses---and they'd never go home and tell their parents." When Mort cautioned Garrett that her actions might come back to haunt her because Garrett was the teacher and thus responsible, Garrett replied "none of these little shits ever go home and say anything." Mort

complained to the vice-principal several times that "Miss Garrett was too rough with the kids, and that I didn't think that the way that she was trying to maintain her class was acceptable." The vice-principal did not investigate, waving off her concerns with a comment that "every teacher has their own way of teaching."

Tacher testified that when she ignored one of her own student's temper tantrum, Garrett told her that "he wouldn't do that if he were in my class because he knows that I would hurt him." Tacher reported this comment to the assistant principal but, apparently, once again no investigation was conducted. She testified that the vice-principal "appeared to be a friend of Garrett's and [was] very protective of her" "to the detriment of the autistic children" and accordingly "refused to take any action with respect to the complaints against Garrett." When Tacher attempted to speak to him about another incident involving Garrett's use of force, he refused to discuss any complaints about Garrett, warning that "we are not talking about Kathy."

Third, the majority fails to consider record evidence that Garrett threatened and intimidated her classroom aides and another teacher, which would support the inference that she was aware of the wrongful nature of her conduct. Mort testified that Garrett made her nervous when she warned her "don't push me or I'll show you a side of the road that you've never seen before," and when she talked about

her boyfriend, who was a magistrate judge in Seminole County, who could "make or break whoever she want[ed] him to make or break." Like Mort, Rodriguez "feared anything that [Garrett] could do to [her]" because Garrett told her she "knew people of higher places . . . [s]he was dating somebody that was a magistrate," and she felt physically threatened by Garrett as well. Rodriguez testified that she believed that Garrett felt she was "invincible and that no harm will come to her" and that accordingly "she ha[d] no problem . . . hurting others or taking out a vengeance." Garrett also prevented Rodriguez from talking to other aides and teachers or from recording everything that happened in class in the children's planners because Garrett did not want parents to know what happened in her classroom, including if their children cried.

Tacher also testified that Garrett "regularly" pressed her 300-pound-plus body against her students, teacher's aides and other teachers as a form of intimidation, explaining that Garrett "would lean over them . . . and press down on – Kathy's a big woman. I mean, several hundred pounds – and kind of lean on them . . . I mean, she got mad at me one time and backed me up against the wall and was leaning on me, threatening me." Tacher explained that when Garrett would press her body against her, she found it "very intimidating . . . [a]nd I'm an

adult and I'm not a small child."[7]

Based upon this record, a reasonable jury could find that Garrett had a history and practice of using physical force and other forms of intimidation against T.W., his classmates, her aides, and other teachers despite her knowledge that these acts were prohibited, inappropriate, and uniquely harmful to T.W.; a finding which would support an inference that Garrett's actions were objectively excessive. A reasonable jury could find as relevant contextual evidence that Garrett had a history of behavior, similar to that alleged by T.W., toward other students, sufficient to support an inference that Garrett's actions towards T.W. were not mistakes or accidents.

### B. Specific Incidents of Garrett's Use of Force Against T.W.

In addition to failing to consider or downplaying all of this contextual evidence, the majority does the same with evidence that creates a genuine issue of material fact pertaining to the specific incidents of Garrett's use of physical force against T.W. It concludes that Garrett's use of force was necessary and justifiable and even if her actions were "inappropriate" they were not of sufficient duration or degree to rise to the level of a constitutional violation. But the disagreement in this record as to what happened, how it happened, and why it happened is a matter

---

[7] At the time of the incidents, T.W. was 5'4" or 5'5" and weighed approximately 160-170 pounds—roughly half of Garrett's 300-plus-pounds.

44

which must be left to a jury to resolve.

First, the majority's analysis conflates the excessiveness of force and its duration, which are independent inquiries. Whether the force was excessive cannot always be answered by reference to the number of minutes the force was endured. The majority failed to consider testimony from Mort, Rodriguez, and Tacher, all educators specially trained to work with developmentally disabled children, that Garrett used force, which a reasonable jury could find was both unnecessary and excessive. For example, during the first incident, in which Garrett pushed T.W. to the floor, straddled him with her pelvic area on his buttocks and pulled his arms behind his back for five minutes, Rodriguez testified that it was inappropriate for Garrett to straddle him, saying that "[y]ou do not ever pull their arms around from them because it can cause asphyxiation . . . ." Rodriguez also testified that you should never "sit on top of a kid. If you need that much help, then you're supposed to call for some help and you do it as a team effort of restraining the child." A reasonable jury could find that Garrett's straddling of a student, who was half her weight, which placed him at risk of asphyxiation for five minutes, was excessive.

Second, the majority discounts record evidence that, on specific occasions, Garrett was motivated to act, not for a legitimate, disciplinary reason, but because

of malice and sadism. For example, regarding the second incident, the majority finds Garrett was justified in using force when T.W. simply walked away from Garrett, after failing to follow one of her instructions to the class. This conclusion, however, has no rationale in either the facts or the law. Physical corporal punishment is not a permissible response to the failure to follow instructions, and even Garrett testified that physical restraint should only be used as a "last resort." That T.W. resisted her use of force by attempting to avoid it and by swinging his arms[8] without touching Garrett is likewise no excuse or justification for Garrett to force him down to the floor sufficiently "hard" such that "[t]hey both probably got hurt that day, as Mort testified, before pulling his right leg up against the back of his left leg." The need for force in this incident is a uniquely fact- and credibility-intensive question reserved for a jury.[9]

Likewise, it is a jury question whether Garrett's response to T.W.'s "self-injurious" conduct of scratching a bug bite during the third incident was legitimate

---

[8] There is no question that, as Mort testified, T.W. did not touch Garrett as he was swinging his arms. Mort, the teacher's aide present at the time, testified that Garrett forced T.W. to the floor because he had disobeyed her order to go to the "cool-down room," was walking away from her, and swung his arms out when she tried to restrain him in standing position.

[9] At the time Garrett started at SSMS, she had not been certified in CPI (Crisis Prevention Intervention), a program teaching approved behavior management techniques. Rodriguez, one of her aides, however had the requisite training and certification in CPI on physical restraints, but Garrett ignored her advice and services and herself applied both corporal punishment and restraints to T.W. and other students. Based upon this evidence, a reasonable jury could find that Garrett's use of force was objectively unreasonable.

46

or unjustified. Mort's testimony indicated that when T.W. did not stop scratching himself, Garrett was motivated to act, not by a pedagogical purpose, but by her desire to dominate him; she had to be the boss and what she ordered had to be done. Mort testified that Garrett's pulling T.W. from his chair and pinning his body against his desk was inappropriate because it caused T.W. to hit his legs on the edge of his desk and T.W. repeatedly cried out for Garrett to stop because she was hurting him. Despite this, Garrett restrained T.W. in this manner for four minutes before she eventually released him.

During the fourth incident, the majority concedes that "there is <u>no evidence in the record</u> as to what prompted Garrett" to pin T.W.'s hands behind his back and lead him to the cooldown room. Nonetheless, the majority impermissibly fills this void by speculating that since the restraint occurred while Garrett led T.W. to the cooldown room, it "suggests that the restraint served some pedagogical objective." Panel Op. 24. This "suggestion" is entirely unsupported by the record; nothing in the record demonstrates that Garrett had <u>any</u> justification for her use of force in this instance nor does she provide one. The majority appears to suggest that <u>any</u> disciplinary act undertaken by a teacher is <u>per se</u> necessary, justifiable, and proportionate. This is not so and cannot be. The fact that T.W.'s teacher led him to a cooldown room does not mean that it was warranted in the first place or the

47

appropriate response. If anything, this presents a genuine issue of material fact for the jury.

As to the fifth incident, the majority acknowledges that tripping T.W. after barricading him in the darkened cooldown room for several minutes "was unrelated to T.W.'s disruptive behavior and lacked a disciplinary purpose," but concludes the tripping does not rise to the level of a constitutional violation. Panel Op. 21.[10] I am not sure that tripping alone would rise to a constitutional violation. But it is up to a reasonable jury to determine whether Garrett's actions as a whole, including tripping this autistic child, shocks the conscience. By failing to consider this incident in the context of all of the other record evidence about Garrett's behavior toward T.W. and other students in her classroom, the majority fails to consider that a reasonable jury could find that this easily supports the inference that Garrett's actions were motivated by malice or sadism.[11]

Finally, the majority opinion discounts the severity of the psychological injuries T.W. suffered. The violation of the right to bodily integrity must include violations of a psychological and developmental nature. It is plainly a jury

---

[10] Certainly, I agree with the majority that there is no disciplinary or didactic purpose for tripping a developmentally disabled student who has just been confined in a darkened room, nor can there be any post-hoc rationalization of it.

[11] Mort also testified that T.W., upon exiting the cooldown room, said that Garrett had hit him.

question whether the injury suffered by T.W. is severe enough. A reasonable jury, based upon this record, could find that it was. Evidence here demonstrates that, in addition to his physical injuries, T.W.'s developmental disability was severely aggravated as a direct result of Garrett's conduct, so much so that he regressed in his development. T.W. was also diagnosed with post-traumatic stress disorder as a result of Garrett's treatment, which led to immediate, profound, and long-term developmental injuries. T.W.'s behavior changed significantly; he suffered panic attacks, could not sleep, feared and thus was unwilling to go to school, cried on the way to and from school, urinated everywhere, and was unable to close bathroom doors. Eventually, these injuries led to T.W. dropping out of school, which has led to another educational, life-altering, developmental injury.

A reasonable jury could find, based upon the totality of the evidence about Garrett's education, training, use of physical force against other special needs students, intimidation of her classroom aides and other teachers, and her knowledge of T.W.'s particular vulnerability to physical touch, that Garrett's actions were unjustified, objectively and subjectively excessive, and motivated by malice or sadism.

## II.

The majority opinion seeks to unravel the tapestry of Garrett's pattern and

49

practice of teasing, provoking, and agitating T.W. on a daily basis that form the background against which we must consider her several incidents of physical force. The factors enumerated in Neal[12] aid our determination of what qualifies as conscience-shocking abuses of power. However, we must be mindful that our focus is always on whether, given the totality of the circumstances, a reasonable jury could find that certain conduct shocks the conscience. By evaluating each incident in isolation and divorced from context, the majority fails to consider the totality of the circumstances and fails to read all ambiguities and draw all inferences in T.W.'s favor.

In addition, a distinction must be made between the need for discipline of some kind and the type of discipline used, to wit, physical/corporal punishment. I believe that the majority conflates the two. That there might have existed a need for Garrett to intervene does not necessarily mean that there was a need for Garrett to intervene with significant physical force. When there is no need for force, any

---

[12] T.W. asserts that the Neal test does not apply because Garrett lacked a disciplinary motive for her use of force. This is too cramped a reading of the applicability of the Neal factors. When the use of force is alleged to be unconstitutional, it is analyzed under the bodily integrity component of the rights protected by substantive due process. To do so, a court considers "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted," Neal, 229 F.3d at 1075, as well as "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Id. (citing Metzger v. Osbeck, 841 F.2d 518, 520 (3d Cir. 1988)). This analysis mandates that a court, reviewing the totality of the circumstances, examine the lack of a legitimate need and/or the authorization to inflict corporal punishment as well as the lack of a disciplinary motive.

amount of force must necessarily be disproportionate.[13]  Moreover, that T.W.

eventually capitulated to Garrett's use of force does not demonstrate, as the

majority suggests it does, that her use of force was proportional to what was

necessary under the circumstances.  Beating a student until he acquiesces will

surely obtain the desired compliance, but does not answer the question of whether

that use of force was necessary in the first  place.

In sum, the right to be free from the use of force is a subset of the liberty

interest in bodily integrity that is protected by the Due Process Clause.[14]  The right

---

[13] In P.B. v. Koch, the Ninth Circuit recognized that there was no need for a principal to slap, punch, and choke three students and that this use of force bore "no reasonable relation to the need."  96 F.3d 1298, 1304 (9th Cir. 1996).  That court reasoned that

> because there was no need for force, one can reasonably infer that [the principal] took these actions not in good faith but for the purpose of causing harm . . . . Whether we describe the 'right' as the right to bodily integrity, the right to be free from 'unjustified intrusions on personal security,' the right to be free from excessive force, or the right to be free from arbitrary and excessive corporal punishment, it is clear that a principal, who physically assaulted his students in the manner Koch allegedly did, has violated their clearly established constitutional rights.

Id. (internal citations omitted).

[14] In Graham v. Connor, 490 U.S. 386, 394 (1989), the Supreme Court held that allegations of excessive force should be analyzed under a more specific constitutional provision, rather than generalized notions of due process, if one is applicable.  "In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct."  Id. The Eighth Amendment does not apply to excessive force against students.  See Ingraham, 430 U.S. at 664. The only amendment other than the Fourteenth that arguably applies to the use of excessive force against a student is the Fourth.  At least two circuits have applied the Fourth Amendment to a teacher's use of excessive corporal punishment against a student.  See Doe ex rel. Doe v. Hawaii Dep't of Educ., 334 F.3d 906, 909 (9th Cir. 2003); Wallace ex rel. Wallace v. Batavia

to personal security and to bodily integrity is a historic and fundamental right that is implicit in our concept of ordered liberty. Ingraham v. Wright, 430 U.S. 651, 673, n.42 (1977).

A reasonable jury reviewing the record as a whole and in the light most favorable to T.W. could find that Garrett abused her position of power by using it as an "instrument of oppression," Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992), and her conduct was "so brutal" and "offensive to human dignity" that it "shocks the conscience." Rochin v. California, 342 U.S. 165, 172, 174 (1952), partially abrogated on other grounds by Graham v. Connor, 490 U.S. 386 (1989).

---

Sch. Dist., 68 F.3d 1010, 1016 (7th Cir.1995). The Fourth Amendment standard is one of "objective reasonableness" under the circumstances, without regard to the official's underlying intent or motivation. Graham, 490 U.S. at 397. Garrett's alleged actions easily satisfy this standard because there was no need for force and as such, her use of force was objectively unreasonable. In any event, under either a Fourth or Fourteenth Amendment analysis, Garrett's alleged conduct was clearly unlawful.