[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————

No. 12-10473

————————

D. C. Docket No. 8:10-cv-01893-TBM

JIMMY L. HATFIELD,
DEBORAH K. HATFIELD,
as parents and natural guardians of T.H.,

Plaintiffs-Appellees,

versus

DIANA O'NEILL,

Defendant-Appellant.

————————

Appeal from the United States District Court
for the Middle District of Florida

————————

(August 13, 2013)

Before DUBINA, JORDAN, and BALDOCK,[*] Circuit Judges.

PER CURIAM:

_____

[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

This is a 42 U.S.C. § 1983 action involving the alleged abuse of a profoundly mentally handicapped elementary school student. Defendant/Appellant Diana O'Neill ("O'Neill") appeals the magistrate judge's denial of her motion for summary judgment on qualified immunity grounds. After carefully reviewing the record, considering the parties' briefs, and having the benefit of oral argument, we affirm the magistrate judge's order denying summary judgment.

## I. Background

T.H. attended Venice Elementary School in Sarasota County, Florida from 1999 to February 2008. O'Neill was T.H.'s teacher for six years, until she was terminated due to conduct related to this case. This action centers on allegations lodged by Plaintiffs/Appellees James L. Hatfield and Deborah Hatfield ("Appellees"), as parents and natural guardians of T.H., that O'Neill deprived T.H. of her liberty interests protected under the substantive component of the Fourteenth Amendment's Due Process Clause.

Our background is divided into three parts. First, we discuss T.H.'s disabilities. Second, we discuss the incidents that gave rise to Appellees' claims against O'Neill. Third, we discuss the procedural history of this appeal. As O'Neill has appealed the denial of her motion for summary judgment, we construe all facts in the light most favorable to the Appellees. *Peterson v. Baker*, 504 F.3d

1331, 1336 (11th Cir. 2007). In exercising our interlocutory review jurisdiction we have discretion to accept the magistrate judge's factual findings, rather than making our own. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996). We are also permitted to supplement the magistrate judge's factual findings with "additional sufficiency findings of our own from the record where necessary." *Id.* In this case, the magistrate judge declined to set forth factual findings in detail, and we thus have opted to make such findings ourselves after full review of the record. *See Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294 (11th Cir. 1998).

A. T.H.'s Disabilities

Born in 1996, T.H. has endured pronounced mental and physical disabilities her entire life. T.H. has Hemimegalencephaly, a severe brain disorder, which has prevented the left side of her brain from fully developing. T.H. is blind, non-verbal, and is bound to a wheelchair that she is unable to maneuver on her own. She is also plagued by a seizure disorder. Her various ailments render her with the mental and intellectual abilities of a one-year-old child requiring 24-hours-a-day care. T.H.'s condition will never improve.

Prior to the events leading to this lawsuit, T.H. experienced an influx of seizures. At that time, a determination was made to undergo surgery whereby a substantial portion of her brain would be removed and a shunt would be placed

3

therein. [R. 76-2 at 287.] The hope was that this operation would curtail the rash of seizures T.H. was suffering.[1] [*Id.*] This surgical procedure left T.H.'s head extremely tender to the touch at the location where the sizable portion of her brain had been removed. T.H.'s tenderness permeated so much that she experienced pain from mundane activities, such as having her hair brushed. [R. 79-1 ¶ 2.] After the surgery, T.H. had a visible indent in her head. [R. 79-2 at 10–11.] T.H.'s medical conditions were known to Venice Elementary personnel, including O'Neill.

In sum, the record is undisputed that T.H. is an extremely disabled child who is both vulnerable and defenseless. In fact, of the children in T.H.'s "profoundly mentally handicapped" classroom[2], teacher's aide Cindi Anderson ("Anderson") testified that T.H. was probably "the most profoundly handicapped [student]" of the class. [R. 79-2 at 9.]

B. Incidents Leading to T.H.'s Complaint

Because T.H. is unable to effectively communicate, the majority of Appellees' evidence against O'Neill derives from the testimony of Anderson and

---

[1] From the record it is unclear whether T.H. underwent surgery at the age of four [R. 76-2 at 287] or when she was an infant. [R. 79-1 at 1.] The resolution of this factual dispute has no bearing on the outcome of this appeal. Rather, it is germane for present purposes that O'Neill knew of T.H.'s vulnerability due to her previous surgery.

[2] T.H.'s classroom had children who were profoundly mentally handicapped—students with an IQ less than 25— as well as students who were trainably mentally handicapped—students with an IQ between 25 and 50. [R. 76-4 at 418.]

4

fellow teacher's aide, Tamara Cooke ("Cooke").  According to Anderson, O'Neill's misconduct toward the children under her supervision began to escalate in September or October of 2007.  During this period, Mary Pillsbury ("Pillsbury"), the school nurse, grew concerned due to an increased frequency of O'Neill's children requiring medical care.  Pillsbury therefore instructed Anderson and Cooke to document O'Neill's behavior toward the children.  [R. 79-2 at 17.] Below, we detail Anderson and Cooke's testimony as it relates to specific allegations of abuse perpetrated against T.H.

First, Appellees contend that O'Neill "ripped flesh" from T.H.'s lips.  At times, T.H. came to school with excess skin peeling from her lip(s).  T.H.'s grandmother sent Vaseline and instructions to apply it to T.H.'s lips when they would peel.  [R. 79-2 at 22.]  Anderson testified in her deposition, however, that O'Neill "would just take the skin and just rip it right off her lip and it would start bleeding." [*Id.*]  Cooke corroborated Anderson's testimony stating:

> One side of [T.H.'s] mouth would like peel, like a half of her mouth .
> . . and [O'Neill] would just - - if it was hanging out a bit, she would
> just take it and pull it right off, and sometimes it would bleed and it
> would drip down onto her tray and on the table.

[R. 79-4 at 20–21.]  On one occasion, Anderson told O'Neill not to rip the skin off T.H.'s lips, to which O'Neill chuckled and replied: "That's gross.  I don't want to look at that." [R. 79-2 at 22–23.]

5

Second, Appellees allege that O'Neill was purposefully forceful in feeding T.H., causing T.H.'s mouth to bleed. With regard to the forceful feeding, Cooke testified that O'Neill "would really ram [the spoon] in there really hard, and . . . [it] would like smash into her gums, and her gums would bleed." [R. 79-4 at 22.] Appellees contend that T.H. did not bleed when she was fed by other individuals.

Third, Appellees aver that O'Neill shoved T.H.'s thumb down her own throat in an effort to stop T.H. from sucking her thumb. Cooke explained that O'Neill wanted T.H. to stop sucking on her thumb, so "sometimes [O'Neill] would cram it down [T.H.'s] throat like . . . [y]ou want that, I'll give it to you." [R. 79-5 at 122–23.] In response, T.H. would have a gag reflex and let out a "pain cry." [*Id.* at 123.]

Finally, both Anderson and Cooke testified that they personally witnessed O'Neill strike T.H. with her hand and other objects on numerous occasions. In response to an inquiry of how many times she saw O'Neill strike T.H., Anderson stated:

> I saw [O'Neill] strike [T.H.] with her own hand in the back of the head - - in the side of the head, but as far as with different objects, I really couldn't tell you how many times it was; but she would pick up things, you know, if she had a water bottle and, you know, stand there and she would hit her with that or a board[.]

6

[R. 79-2 at 23–24.]  Cooke largely substantiated Anderson's testimony, stating that when T.H. would fail to perform an exercise correctly, O'Neill "would hit her over the head with a water bottle or whatever might have been readily available, a book or a magazine or whatever was around at that time."  [R. 79-4 at 16.]

The most serious of these strikes came on January 29, 2008, and prompted Anderson and Cooke to report O'Neill to the school's administration.  Anderson and Cooke both allege that O'Neill struck T.H. on the head—at the location where T.H. previously had brain surgery.  [R. 79-5 at 63.]   In describing the January incident, Cooke explained that it happened as O'Neill became frustrated with T.H.'s inability to perform a feeding exercise.  [R. 79-4 at 23.]  Attempting to neutralize the situation, Cooke stepped in to assist T.H.  T.H. continued to struggle with the exercise, however, "so [O'Neill] took her hand up in the air . . . and just backhanded [T.H.] over the side of the head."  [*Id.*]  Further clarifying what she had seen, Cooke explained that "it was a hit.  [O'Neill] hit her."  [R. 83-3 at 89.][3]

O'Neill submits that all of her actions above were done for pedagogical reasons and that they were not inspired by malice.  This contention is undercut by Anderson and Cooke's testimony that O'Neill hit T.H. out of frustration and that

_____

[3] As with the other allegations lodged by Anderson and Cooke, O'Neill characterizes her conduct in a different light.  Rather than striking or hitting T.H., O'Neill submits that she "bopped" her and lightly "redirected" her.  For present purposes, however, we must accept the testimony of Cooke and Anderson.

she called T.H. derogatory names.  For example, Anderson claims that O'Neill referred to T.H. as a "fat-ass" and "tons of fun," exclaiming that T.H. was "sucking up oxygen."  [R. 79-2 at 30–31.]  Likewise, Cooke testified that O'Neill stated that T.H. and another student "were a waste of good air and [re]tards."  [R. 79-4 at 24.]  In a similar vein, Cooke claims that O'Neill opined "[w]hat's it going to matter if they get hurt anyway?  They are already retarded."  [*Id.*]  Anderson also avers that O'Neill stated that it didn't matter that she was striking the students, because they couldn't do anything about it.  [R. 79-2 at 31.]

Anderson and Cooke claim that T.H. bled on multiple occasions due to O'Neill's ripping of her skin and jamming a spoon far into her mouth.  Cooke also testified that T.H. expressed pain when O'Neill hit her.  [R. 79-4 at 31.]  Finally, in reflecting back on this time period, Appellees contend "T.H. was experiencing an increase in bruising, vomiting, unhappiness and just a lack of energy at the end of 2007 and up until [O'Neill] was arrested."  [R. 79-1 ¶ 4.]  When O'Neill was removed from T.H.'s classroom T.H.'s "energy and happiness increased, and her vomiting diminished and the bruising stopped."  [*Id.*]

Venice Elementary terminated O'Neill after Anderson and Cooke reported her misconduct.  She was also arrested and charged with four counts of aggravated

child abuse.  After a five day trial, however, O'Neill was found not guilty of all charges.  [R. 76-18.]

C. Procedural History

In August 2010, Appellees, in their capacities as parents and natural guardians of T.H., filed an action against the School District of Sarasota County, Florida (the "School District") and O'Neill.  Appellees' operative complaint was brought pursuant to 42 U.S.C. § 1983 and included allegations that O'Neill, under color of state law, violated T.H.'s liberty interests guaranteed by the Fourteenth Amendment to the United States Constitution.  Appellees' complaint also asserted state law claims for battery and intentional infliction of emotional distress.

In December 2010, a court-appointed mediator entered an order noting that subject to state court approval, Appellees settled their claims against the School District.[4]  Subsequent to settlement with the School District, O'Neill and the Appellees executed a document consenting to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).  The School District did not execute a formal

---

[4] Florida law required Appellees to seek the appointment of a guardian and approval by a circuit judge of the Florida Thirteenth Judicial Circuit before dismissing the School District from the action.

9

consent to the jurisdiction of a magistrate judge, but never objected to the magistrate judge's jurisdiction.[5]

After completing discovery, O'Neill moved for summary judgment claiming that she was entitled to qualified immunity. The magistrate judge entered an order denying O'Neill's motion. O'Neill then perfected this timely interlocutory appeal.

## II. Standard of Review

"We review *de novo* the denial of a motion for summary judgment based on qualified immunity." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010). In doing so, "[w]e resolve all issues of material fact in the plaintiffs' favor and approach the facts from the plaintiffs' perspective because the issues appealed here concern not which facts the parties might be able to prove, but, rather, whether or not certain facts showed a violation of clearly established law." *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012) (internal alteration and quotation marks omitted).

## III. Substantive Due Process Claim

A. Substantive Due Process Background

---

[5] We have jurisdiction to decide O'Neill's appeal because although the School District did not formally consent to the jurisdiction of the magistrate judge, it did so impliedly. *See Chambless v. La.-Pac. Corp.*, 481 F.3d 1345, 1350–51 (11th Cir. 2007) (finding implied consent to the magistrate judge's jurisdiction where the appellant was aware of the need to consent and the right to refuse it and voluntarily and continually participated in proceedings before the magistrate judge for eight months).

Due process challenges come in two forms, procedural and substantive. Although procedural challenges are common in the school setting, Appellees assert a substantive challenge against O'Neill claiming that her conduct toward T.H. was arbitrary, egregious, and conscience-shocking in the constitutional sense.

The substantive component of the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125, 112 S. Ct. 1061, 1068 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 665 (1986)). This protection is "intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 1716 (1998) (internal quotation marks omitted). Conduct "properly . . . characterized as arbitrary, or conscience shocking, in a constitutional sense" violates this protection. *Id.* at 847, 118 S. Ct. at 1717. While no precise rubric exists in making this determination, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849, 118 S. Ct. at 1718. "Numerous cases in a variety of contexts recognize it as a last line of defense against those literally outrageous abuses of official power whose very variety makes formulation

11

of a more precise standard impossible." *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980).

The Supreme Court has cautioned against "expand[ing] the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins*, 503 U.S. at 125, 112 S. Ct. at 1068. Following this mandate, the Supreme Court and our court "have both said repeatedly that the Fourteenth Amendment is not a 'font of tort law' that can be used, through section 1983, to convert state tort claims into federal causes of action." *Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1074 (11th Cir. 2000) (citing *Cnty. of Sacramento*, 523 U.S. at 848, 118 S. Ct. at 1718).

B. Substantive Due Process in the School Context

Our court has determined that "excessive corporal punishment, at least where not administered in conformity with a valid school policy authorizing corporal punishment . . . may be actionable under the Due Process Clause when it is tantamount to arbitrary, egregious, and conscience-shocking behavior." *T.W. ex. rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla.*, 610 F.3d 588, 598 (11th Cir. 2010) (quoting *Neal*, 229 F.3d at 1075).

Corporal punishment in schools typically refers to the application of physical force by a school official to punish a student for some type of school-

related misconduct. *Ingraham v. Wright*, 430 U.S. 651, 661, 97 S. Ct. 1401, 1407 (1977). As alleged by Appellees, the force applied by O'Neill in this case does not fall within this traditional definition, as T.H. did not engage in misconduct. Nonetheless, our court has analyzed applications of force outside of this traditional definition under the same standard. *See Neal*, 229 F.3d at 1072 (noting that "[n]ot all corporal punishment cases arise under [traditional] circumstances . . . and may involve less traditional, more informally-administered, and more severe punishments"). [6] Under this broader view, we analyze O'Neill's conduct under the "shocks the conscience" standard we have previously employed in our corporal punishment cases.

Appellees' claim of excessive corporal punishment has "an objective and a subjective component, both of which must be met before [O'Neill] may be subject to liability." *Neal*, 229 F.3d at 1075 n.3. The evidence must support a reasonable inference that the punishment is "obviously excessive" as an objective matter and that O'Neill "subjectively intend[ed] to use that obviously excessive amount of force in circumstances where it was foreseeable that serious bodily injury could

---

[6] Further, neither the parties, nor any other circuit, have offered an alternative analysis that we ought to apply in situations where the force was not considered corporal punishment. *See Fessler v. Giles Cnty. Bd. of Educ.*, No. 1-00-0120, 2005 WL 1868793, at *10 (M.D. Tenn. July 27, 2005) (collecting cases applying the "shock the conscience" standard outside of corporal punishment context, and noting "[w]hat is relevant is not the characterization of the alleged conduct but whether that conduct shocks the conscience").

result." *Id.* To determine whether force is "obviously excessive, we consider the totality of the circumstances." *Id.* at 1075. Because we consider the totality of the circumstances, we take into account T.H.'s disability. And because T.H.'s disability is profound, rendering her completely vulnerable and defenseless, this factor is of particular significance in this case.

At the outset, we conclude that Appellees' allegations regarding forceful feeding and the removal of skin from T.H.'s lips do not shock the conscience. There is a range of teacher conduct that is simply "no[t] so conscience-shocking as to trigger a substantive due process violation." *See Wilson*, 610 F.3d at 599 (internal quotation marks omitted). Forceful feeding and ripping excess skin from T.H.'s lips falls within that range. Allegations related to O'Neill forcing T.H.'s thumb down her throat in an effort to stop her from sucking her thumb are certainly more troubling, but fall within this range as well. We next consider whether O'Neill's striking a defenseless and profoundly disabled child on the head—at the precise location where she had previously undergone brain surgery and was particularly vulnerable—shocks the conscience of the court. We conclude that it does.

C. Application

14

As explained above, to determine whether O'Neill's use of force against T.H. was "obviously excessive, we consider the totality of the circumstances." *Neal*, 229 F.3d at 1075.  Three factors, however, are particularly relevant: "(1) the need for the application of corporal punishment, (2) the relationship between the need and amount of punishment administered, and (3) the extent of the injury inflicted."  *Id.*

Turning to the first factor, it is apparent that the need for O'Neill's use of force against T.H. was nonexistent.  Construing the evidence in Appellees' favor, O'Neill was not acting in self-defense, with a disciplinary purpose, or to protect T.H.  Consequently, we conclude that O'Neill's conduct in striking this defenseless child was "intended to injure in some way unjustifiable by any government interest." *Cnty. of Sacramento*, 523 U.S. at 849, 118 S. Ct. at 1718.  Absent a governmental interest to strike this profoundly disabled and defenseless child on the head, where she was particularly vulnerable due to her previous brain surgery, this first factor favors Appellees.  *See P.B. v. Koch*, 96 F.3d 1298, 1304 (9th Cir. 1996) (finding where "there was no need to use force . . . the force [the school official] allegedly used . . . b[ore] no reasonable relation to the need"); *Webb v. McCullough*, 828 F.2d 1151, 1159 (6th Cir. 1987) ("[B]ecause it is possible that the blows were not disciplinary in nature, a trier of fact could find that under the

15

circumstances, [the principal's] need to strike [the plaintiff] was so minimal or non-existent that the alleged blows were a brutal and inhumane abuse of [the principal's] official power, literally shocking to the conscience."); *Gonzales v. Passino*, 222 F. Supp. 2d 1277, 1282 (D.N.M. 2002) (finding where "there was little or no need for [the school official's] application of force" the student had "satisfied the first two factors," i.e., the need for application of force and the relationship between the need and amount of force that was used).

Because T.H.'s conduct warranted no force, and striking her was not justified by a governmental interest, the second factor—the relationship between the need and amount of force administered—also favors Appellees.

The third factor—the extent of T.H.'s injury—presents more difficulty to the Appellees. Due to T.H.'s profound disabilities it is difficult to discern the exact nature of T.H.'s injuries as T.H. was unable to apprise her parents of O'Neill's conduct. Notwithstanding this difficulty, Appellees submit evidence that as a result of O'Neill's force, T.H. experienced bruising, vomited, showed a lack of energy, and cried with pain. While it is evident that T.H.'s injuries are certainly not as severe as those suffered by the student in *Neal*[7]—our circuit's seminal

---

[7] In *Neal*, a high school coach intentionally struck a student with a metal weight lock because that student hit a fellow student with the same. 229 F.3d at 1071. The blow knocked the student's eye out of socket. *Id.*

16

substantive due process case dealing with corporal punishment—we nevertheless conclude that Appellees are able to state a substantive due process claim.

First, although T.H.'s injuries were less severe than the student's injuries in *Neal*, our reasoning in *Neal* is similarly applicable here as O'Neill "intentionally us[ed] an obviously excessive amount of force that presented a reasonably foreseeable risk of serious bodily injury." *Id.* at 1076. Simply put, striking a profoundly mentally and physically handicapped child on the head—in a place where that child is particularly vulnerable due to a soft spot on her skull resulting from surgery—was obviously excessive and "presented a reasonably foreseeable risk of serious bodily injury." *Id*.

Second, although the injury in *Neal* was extraordinarily severe, we did not decide in that case "how 'serious' an injury must be to support a [substantive due process] claim." 229 F.3d at 1076. Indeed, after *Neal* we found a much lesser injury sufficient to support a substantive due process claim in this context. Specifically, in *Kirkland ex rel. Jones v. Greene County Board of Education*, 347 F.3d 903 (11th Cir. 2003) (corporal punishment case affirming denial of qualified immunity), a school official struck an unarmed and unthreatening student with a metal cane with enough force to cause a large knot and continuing migraine headaches. 347 F.3d at 904. Our court found a viable substantive due process

17

claim because "(1) [the] school official intentionally used an amount of force that was obviously excessive under the circumstances, and (2) the force used presented a reasonably foreseeable risk of serious bodily injury." *Id.* (quoting *Neal*, 229 F.3d at 1075.)

Both of the above criteria are likewise met in this case. That is, looking to the "totality of the circumstances," O'Neill intentionally used an amount of force that was obviously excessive under the circumstances, and just like the school officials' in *Kirkland* and *Neal*, O'Neill's conduct presented a foreseeable risk of serious bodily injury.[8] And, at any rate, while the extent and nature of T.H.'s injuries is an important factor in our analysis, it is indeed "*only one factor in our analysis*." *Wilson*, 610 F.3d at 601 (emphasis added); *see also Neal*, 229 F.3d at 1076 (noting that courts treat "the extent and nature of the injury as simply one factor (although an important one) to be considered in the totality of the circumstances"). Thus, even though we acknowledge that this factor presents a closer call, all other factors clearly favor the Appellees.

---

[8] In support of her position, O'Neill relies heavily on the following statement in *Peterson*:

> the standard is shock the conscience and totality of the circumstances; and *when some reason exists for the use of force*, constitutional violations do not arise *unless the teacher inflicts serious physical injury upon the student*.

[Appellant Br. at 23 (quoting *Peterson*, 504 F.3d at 1338 (emphasis added)).] O'Neill's reliance on the above statement is misplaced, however, because in construing the facts in the light most favorable to Appellees, *no* legitimate reason existed for O'Neill's use of force.

Finally, in determining whether O'Neill's conduct "shocks the conscience," we are to consider the totality of the circumstances. *Neal*, 229 F.3d at 1075. As such, T.H.'s severe disabilities must be factored into the calculus. In this regard, we agree with District Court Judge John Antoon's statement in *M.S. ex rel. Soltys v. Seminole County School Board*, 636 F. Supp. 2d 1317 (M.D. Fla. 2009), that the "the conscience-shocking threshold is more quickly reached in cases where the victim is particularly vulnerable to abuse and is otherwise defenseless." *Id.* at 1323. Considering T.H.'s profound mental and physical disabilities, we conclude O'Neill's alleged conduct in striking her on the head where she previously had brain surgery "so brutal, demeaning[,] and harmful as literally to shock the conscience of the court." *Neal*, 229 F.3d at 1075 (internal quotation marks omitted).

Turning next to the subjective component under *Neal*, we conclude that in construing the evidence in the light most favorable to Appellees, a reasonable inference exists that O'Neill "subjectively intend[ed] to use [an] obviously excessive amount of force in circumstances where it was foreseeable that serious bodily injury could result." *Id.* at 1075 n.3. Specifically, Anderson and Cooke's testimony that O'Neill made numerous derogatory statements directed at T.H. and that she struck T.H. at the location where she knew that T.H. was particularly

19

vulnerable creates an inference of subjective malice.   This testimony coupled with the lack of a legitimate governmental interest in subjecting T.H. to force is sufficient to make the subjective showing required under *Neal*.

   D. Clearly Established Law

   O'Neill also claims that in the event we find a constitutional violation, she is still entitled to qualified immunity because the constitutional right she violated was not clearly established.  We disagree.  The right to be free from "excessive corporal punishment, at least where not administered in conformity with a valid school policy authorizing corporal punishment," is clearly established under the law of this circuit.  *Neal*, 229 F.3d at 1075.  That is, since *Neal*, we have held that, where an exercise of corporal punishment is so brutal, demeaning and harmful as literally to shock the conscience of the court, a student's substantive due process rights are implicated.  *See id.*  That statement of law applies with such "obvious clarity" to O'Neill's alleged conduct—striking a profoundly mentally and physically handicapped child on the head in a place where she was particularly vulnerable due to her previous surgery *for no legitimate reason*—that O'Neill had a "fair and clear warning" that her conduct was unlawful "even though 'the very action in question has [not] previously been held unlawful.'"  *United States v. Lanier*, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227 (1997) (internal citation omitted).

20

## IV. Conclusion

We remain committed to our stated concern in *Neal* that we do not wish to open the door to a flood of complaints by students objecting to traditional and reasonable corporal punishment.  *See Neal*, 229 F. 3d at 1076.  Under the facts of this case, however, we find that the alleged conduct of O'Neill "truly reflects the kind of egregious official abuse of force that would violate substantive due process protections in other, non-school contexts." *Id.*  For the foregoing reasons, the magistrate judge's denial of O'Neill's motion for summary judgment is affirmed.

**AFFIRMED.**