[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13480

Non-Argument Calendar

_____

SCHYLER HARRIS,
by and through his Guardian as next friend Tracy Davis,
TRACY DAVIS,
individually,

                                        Plaintiffs-Appellants,

*versus*

RICHARD AUTRY, et al.,

                                        Defendants,

ANTONIO CAMMON,
individually and in his official capacity as a paraprofessional,

2                    Opinion of the Court                    20-13480

and as an employee of RCPS,

                                              Defendant-Appellee.

—————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cv-01197-JPB

—————————————

Before LUCK and BRASHER, Circuit Judges.*

PER CURIAM:

Five-year-old Schyler Harris and his grandmother, Tracy Davis, sued Antonio Cammon, a teacher's aide at his school, for assault and battery, false imprisonment, and violations of Harris's Fourth, Eighth, and Fourteenth Amendment rights under 42 U.S.C. section 1983.[1]  The district court dismissed their complaint

—————————————

* This opinion is being entered by a quorum pursuant to 28 U.S.C. § 46(d).

[1] Harris also brought various state constitutional claims, a claim for negligent hiring and retention, and claims under the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the Individuals with Disabilities Education Act. Harris abandoned his claim for negligent hiring and retention and his claim under the Individuals with Disabilities Education Act in the district court.  The district court dismissed the remaining state and federal counts for failure to state a claim, and Harris does not appeal the dismissal.

for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  We affirm.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Harris was a student at Shoal Creek Elementary in Rockdale County, Georgia.  Harris suffered from a disability and was placed in special-needs classes.  When Harris enrolled in 2015, Davis gave Harris's teacher her phone number in case she needed to be contacted about Harris.  Davis said that Harris was "prone to disability-related outbursts" and she should be called if one occurred.  Harris's teacher assured Davis that she would be contacted if Harris had an outburst.

In January 2016, Davis started to notice that Harris's outbursts had become more frequent and more intense.  On April 28, 2016, the school's principal called Davis and said that there had been "a little problem" with Harris, but he had calmed down after "one of his outbursts" and "would be ok."  After Harris returned home from school, Davis asked Harris why he had "acted up."  Harris said that he had been crying because Cammon, a paraprofessional at the school, "hung" him from the chalkboard.  Harris explained to his grandmother that he had kicked his book bag across the floor, so Cammon "picked [him] up and hung [him] from the chalkboard."  When Cammon lifted him, Harris said that his head struck a desk and almost "cracked open."

The following day, Davis confronted the school's principal about the incident. The principal admitted that he had witnessed Harris hanging from the chalkboard. Harris's teacher also admitted in a written statement that she saw Harris hanging from the chalkboard and told Cammon to "unhook" him. One of the students in the classroom reported that this was not the first time Cammon had hung Harris from the chalkboard.

Later, the principal said in a written statement that he heard screaming coming from Harris's classroom on the morning of the incident. The principal peered through a window in the classroom door and saw Harris "hanging from the bulletin board by his pant belt loop." The principal entered the classroom and told Cammon to take Harris down. The principal wrote in his statement that Harris's teacher and the other students in the room were laughing at Harris. The principal had previously received emails from parents accusing Cammon of abusing or mistreating disabled students.

Cammon said in a written statement that the hanging incident was "nothing different than the other times." Cammon dealt with Harris "differently," he wrote, because Harris "like[d] to get physical when we were on the same plane." Cammon also said in his report that he "always lifted [Harris] above [him]" and "used to lift him up and hold him but that got exhausting."

Cammon prepared a second written statement for the county sheriff. Cammon said that on the day of the incident he had received a call to go to Harris's classroom. When Cammon walked into the classroom, Harris was on the ground "screaming and

defiant." Cammon "picked [Harris] up from the floor and went to the board and elevated him." According to Cammon, this was just the "normal procedure" for calming Harris down.

The school launched an investigation and concluded that Cammon had failed to use proper deescalation techniques and had violated school policy. The school's social services case manager determined in a report that Cammon had "emotionally abused" Harris. After the incident, Harris entered therapy and was diagnosed with posttraumatic stress disorder.

Harris[2] sued the school district and various school employees in their official and individual capacities, including Cammon, in state court. He brought state law claims for assault and battery, intentional infliction of emotional distress, and false imprisonment, and section 1983 claims for violations of his Fourth, Eighth, and Fourteenth Amendment rights. The defendants removed the case to federal court.

Every defendant—besides Cammon—either successfully moved to dismiss the complaint for failure to state a claim, successfully moved for a judgment on the pleadings, or was voluntarily dismissed. But Cammon took no action in the case and didn't file any responsive pleadings. The district court found that Cammon

---

[2] Even though Harris and Davis were both plaintiffs, for ease of reference, we will refer to Harris to mean both of them.

had been properly served and directed the clerk to enter a default against him.

Harris moved for a hearing to determine damages as to Cammon's default. The district court denied the motion because Harris had not moved for a default judgment. A default judgment motion was necessary, the district court explained, because "a defaulted defendant is deemed to admit the plaintiff's well-pleaded allegations of fact" but is "not held to admit facts that are not well-pleaded or to admit conclusions of law."

Harris then filed a motion for default judgment. The district court denied the motion because it provided no "analysis or argument" regarding "the legal sufficiency of the claims against Cammon." The district court gave Harris one "last opportunity" to file a sufficient motion for default judgment.

Harris filed a second motion for default judgment. The district court denied this motion because, like the first one, it was "devoid of any analysis" showing that the complaint's allegations were legally sufficient. The district court ordered Harris to show cause as to why his complaint against Cammon should not be dismissed for failure to state a claim. Harris filed a brief arguing that his claims against Cammon withstood rule 12(b)(6), entitling him to default judgment.

The district court entered an order dismissing all but one of the claims against Cammon. As to the state claims, the district court concluded that the assault and battery claim failed because

the complaint alleged only "conclusory statements." The false imprisonment claim failed, the district court concluded, because the complaint didn't allege that Harris's detention or restraint was unlawful. But the district court concluded that the complaint did state a claim for intentional infliction of emotional distress.

As to Harris's federal claims, the district court concluded that Cammon couldn't be sued in his official capacity because the state entity employing him—the school district—had been a party to the suit. The district court then concluded that the section 1983 Fourth and Eighth Amendment claims against Cammon in his individual capacity failed because a claim of excessive corporal punishment has to be brought under the Due Process Clause of the Fourteenth Amendment and not under the Fourth or Eighth Amendments. Finally, the section 1983 Fourteenth Amendment substantive due process claim failed, the district court concluded, because Cammon acted with a "pedagogical objective" and his use of force wasn't obviously excessive.

The district court entered default judgment against Cammon as to the intentional infliction of emotional distress claim. The district court then held a hearing on damages and awarded Harris $267,140.02. Harris now appeals from the district court's dismissal of the other claims in his complaint.

## II.　STANDARD OF REVIEW

We review de novo the district court's sua sponte dismissal of a complaint for failure to state a claim. *Am. United Life Ins. Co.*

v. Martinez, 480 F.3d 1043, 1057 (11th Cir. 2007). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Our review has two steps: we (1) "eliminate any allegations in the complaint that are merely legal conclusions"; and (2) for any "well-pleaded factual allegations, we assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (cleaned up).

## III.    DISCUSSION

Harris contends that the district court erred by stepping into Cammon's shoes and making legal arguments on his behalf. And Harris argues that his complaint plausibly stated claims against Cammon for assault and battery, false imprisonment, and violations of his Fourth, Eighth, and Fourteenth Amendment rights in Cammon's official and individual capacity.

### The District Court's Application of Rule 12(b)(6)

Harris first argues that the district court improperly "stepped into the shoes" of Cammon and made legal arguments on his behalf after he failed to answer the complaint.

Where a defendant has been properly served and defaults, a plaintiff is not automatically entitled to entry of judgment. Rather,

the plaintiff "must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2). "While a defaulted defendant is deemed to admit the plaintiff's well-pleaded allegations of fact, he is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005) (cleaned up). "Entry of default judgment is only warranted when there is 'a sufficient basis in the pleadings for the judgment entered.'" *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).

We have interpreted this "sufficient basis in the pleadings" standard "as being akin to that necessary to survive a motion to dismiss for failure to state a claim." *Id.*; *see also Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim."). Thus, "a motion for default judgment is like a reverse motion to dismiss for failure to state a claim," requiring the district court to assess the legal sufficiency of the claims. *Id.* Because the district court was required to determine whether Harris's complaint stated a claim for relief before it could enter a default judgment, it didn't err in applying the standards of rule 12(b)(6) to his complaint.

### Assault and Battery

The district court dismissed Harris's claim for assault and battery because his complaint "fail[ed] the threshold requirement of alleging the elements of [these] torts" and alleged only

"conclusory statements." Harris argues that he stated a claim for assault and battery because Cammon "repeatedly hanged [Harris] from a hook in front of students" and was later convicted of battery.[3]

Under Georgia law, a "cause of action for battery will lie for any unlawful touching, that is, a touching of the plaintiff's person, even if minimal, which is offensive." *Lawson v. Bloodsworth*, 722 S.E.2d 358, 360 (Ga. Ct. App. 2012). "An offensive touching is one which proceeds from anger, rudeness, or lust. The test is what would be offensive to an ordinary person not unduly sensitive as to his dignity." *Ellison v. Burger King Corp.*, 670 S.E.2d 469, 473 (Ga. Ct. App. 2008) (cleaned up). An assault, on the other hand, is the "apprehension" of an imminent violent injury. *Capitol T.V. Serv., Inc. v. Derrick*, 293 S.E.2d 724, 725 (Ga. Ct. App. 1982).

Here, Harris alleged in his complaint that Cammon battered Harris by "lifting [Harris] above his head, hanging him on a chalk board by his pants[,] and preventing him from moving," which "constitute[d] [a] battery." Although the title to this count also referred to a "physical assault," the body of the count didn't allege that an assault occurred. Nor did this count allege that Harris was in "apprehension" of imminent violent or offensive contact. Thus, Harris failed to state a claim for assault. *See id.*

---

[3] Cammon was convicted in state court of misdemeanor battery. That fact, which was not alleged in the complaint, has no bearing on our analysis or the sufficiency of Harris's allegations.

On the other hand, the complaint did allege that a battery occurred when Cammon touched Harris by "lifting" him and "hanging" him "by his pants." Although Harris didn't allege that this touching was "offensive," we can plausibly infer from these allegations that lifting an elementary school student and hanging him by his pants in front of his laughing peers would be "offensive to an ordinary person not unduly sensitive as to his dignity." *See Ellison*, 670 S.E.2d at 471, 473 (holding that, because of "the relatively low threshold required to prove battery," a battery claim raised a jury question where a restaurant manager put her hands around the plaintiff's neck and shook her three times).

But that's not the end of the matter. Under Georgia's constitution, official immunity "protects an officer from personal liability arising from his performance of 'official functions' as long as the officer did not act with 'actual malice' or 'actual intent to cause injury.'" *Gates v. Khokhar*, 884 F.3d 1290, 1304 (11th Cir. 2018) (quoting Ga. Const. art. I, § 2, para. IX(d)). The doctrine of official immunity "applies to an officer's 'discretionary actions taken within the scope of his official authority.'" *Id.* (quoting *Cameron v. Lang*, 549 S.E.2d 341, 344 (Ga. 2001) (alteration adopted)). A complaint fails to state a claim under rule 12(b)(6), and official immunity applies, where "[n]one of the facts alleged in the complaint support a plausible claim that" the defendant "acted with actual malice or an actual intent to injure" the plaintiff. *Id.* at 1305. We conclude that, as to the battery claim, Harris's complaint failed to plausibly

allege that Cammon acted with actual malice or the actual intent to cause injury.

Actual malice is the "deliberate intention to do wrong." *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999) (citation omitted). Establishing actual malice to overcome official immunity is a high bar; it's "not established merely by showing that the defendant acted with 'ill will.'" *Gates*, 884 F.3d at 1304. "Nor does actual malice encompass merely the reckless disregard for the rights and safety of others." *Id.* (citation and quotation marks omitted). And "the phrase 'actual intent to cause injury'—as used in Georgia's official immunity provision—means 'an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury.'" *Id.* (citation omitted).

Here, in using force on Harris in a botched attempt to control his behavior, Cammon was performing a discretionary action within the scope of his official authority. *See Griswold v. Collins*, 734 S.E.2d 425, 427 (Ga. Ct. App. 2012) ("As a teacher, Collins was required to exert discipline, control and supervision over the students in her classroom, acts that this Court has held constitute discretionary acts involving the exercise of personal deliberation and judgment."). Thus, the question is whether Harris plausibly alleged that Cammon acted with actual malice or an actual intent to injure him. *See Gates*, 884 F.3d at 1304.

"None of the facts alleged in the complaint support a plausible claim that [Cammon] acted with actual malice or an actual intent to injure [Harris], as those terms have been defined by the

Georgia Supreme Court." *See id.* Rather, Harris's complaint established that Cammon hung him up from the chalkboard in a misguided attempt to restore order to the classroom. Cammon told the police that because Harris was "on the floor screaming and defiant," he "elevated" Harris "to calm him down." According to the complaint, another school employee said that Harris "was having a really hard time following instruction[s] and calming down," and was upset and "throwing his chair across the room." And Harris himself, his complaint alleged, said that Cammon lifted him up because he "was acting bad." If anything, these allegations establish a *lack* of malice; Harris alleged that Cammon hoisted him to discipline him and calm him down, not to deliberately do wrong and harm him.

Perhaps Cammon acted with "reckless disregard for the rights and safety of others," but that's not enough to establish malice and overcome official immunity. *See id.* (citation and quotation marks omitted). Because Harris didn't plausibly allege that Cammon acted with actual malice or the actual intent to injure him, the doctrine of official immunity barred his claim. We therefore affirm the district court's dismissal of Harris's battery claim.

## False Imprisonment

Harris argues that the district court erred by dismissing his claim for false imprisonment because his complaint "adequately plead[ed] details" to make out this count. Under Georgia law, the tort of false imprisonment "is the unlawful detention of the person of another, for any length of time, whereby such person is deprived

of his personal liberty." *Henley v. Payne*, 945 F.3d 1320, 1330 (11th Cir. 2019) (citing O.C.G.A. § 51-7-20).

Here, the complaint conclusorily alleged that Cammon falsely imprisoned Harris "by unlawfully restraining him" but did not allege or explain why this restraint was unlawful. All that Harris alleged in his complaint was a legal conclusion and that isn't enough. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1320 (11th Cir. 2006) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal" (citation and quotation marks omitted)). Because the complaint didn't plausibly allege that Harris's detention was unlawful, we affirm the district court's dismissal of this claim.

## Official Capacity

The district court dismissed the section 1983 claims against Cammon in his official capacity because the school district, Cammon's employer, was a party to the lawsuit. Harris argues that the district court erred in doing so because the school district had knowledge of Cammon's "violent propensities," Cammon used his position as a paraprofessional to abuse Harris, and he "conspired" with Harris's teacher to punish the child.

Where a state official is sued under section 1983 in his or her official capacity, "the suit is simply another way of pleading an action against an entity of which [the state official] is an agent." *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (citation and quotation marks omitted). These types of actions are

therefore just "suits directly against" the municipality that employs the state official. *Id.* "Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly[.]" *Id.*

Here, because Harris sued the school district, Cammon's employer, his section 1983 claims against Cammon in his official capacity were "functionally equivalent" to his claims against the school district. *See id.* But the district court dismissed the section 1983 claims against the school district, and Harris doesn't appeal the dismissal of those claims. It was therefore appropriate to also dismiss the section 1983 claims against Cammon in his official capacity. *See id.* (affirming directed verdict in favor of officers sued in their official capacity where the municipality was also a party to the case).

Harris also argues that because Cammon's actions were malicious, he wasn't entitled to qualified immunity and official immunity under state law. But the fact remains that the section 1983 claims against him in his official capacity were redundant because Harris brought these same claims against the school district. The district court therefore correctly dismissed the section 1983 claims against Cammon in his official capacity.

*Section 1983 Fourth and Eighth Amendment Claims*

Harris argues that the district court erred by dismissing his section 1983 Fourth Amendment claim because Cammon's actions were outrageous, exceeded the bounds of corporal punishment, and therefore amounted to an illegal search and seizure. He similarly argues that his section 1983 Eighth Amendment claim shouldn't have been dismissed because Cammon's actions "shock[ed] the moral sense of the community."

But when "public school teachers or administrators impose disciplinary corporal punishment," the "pertinent constitutional question is whether the imposition is consonant with the requirements of due process." *Ingraham v. Wright*, 430 U.S. 651, 671 (1977) (concluding that "when public school teachers or administrators impose disciplinary corporal punishment, the Eighth Amendment is inapplicable"); *Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1075 (11th Cir. 2000) ("[E]xcessive corporal punishment, at least where not administered in conformity with a valid school policy authorizing corporal punishment as in *Ingraham*, may be actionable under the Due Process Clause when it is tantamount to arbitrary, egregious, and conscience-shocking behavior."). As we said in *Neal*, this approach to school corporal punishment claims "ensure[s] that students will be able to state a claim *only* where the alleged corporal punishment truly reflects the kind of egregious official abuse of force that would violate substantive due process protections in other, non-school contexts." *Id.* at 1076. Because we analyze a corporal punishment claim through the lens

of due process, we affirm the dismissal of the Fourth and Eighth Amendment section 1983 claims.

### *Section 1983 Fourteenth Amendment Substantive Due Process Claim*

Harris argues that the district court erred by dismissing his section 1983 Fourteenth Amendment claim. He argues that his complaint stated a substantive due process claim because hanging a disabled child from a chalkboard "stretched far beyond the concept of corporal punishment" and amounted to egregious and outrageous conduct.

Due process "protects individuals against arbitrary exercises of government power, but only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d 588, 598 (11th Cir. 2010) (citation and quotation marks omitted). Executive action is arbitrary in the constitutional sense when it "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). Both we and the Supreme Court have "said repeatedly that the Fourteenth Amendment is not a 'font of tort law' that can be used, through section 1983, to convert state tort claims into federal causes of action.'" *Neal*, 229 F.3d at 1074 (quoting *Lewis*, 523 U.S. at 848).

"[E]xcessive corporal punishment" can violate due process "when it is tantamount to arbitrary, egregious, and conscience-shocking behavior." *Id.* To state this claim, "the plaintiff must allege facts demonstrating that (1) a school official intentionally used

an amount of force that was obviously excessive under the circumstances, and (2) the force used presented a reasonably foreseeable risk of serious bodily injury." *Id.* "In determining whether the amount of force used is obviously excessive, we consider the totality of the circumstances. In particular, we examine: (1) the need for the application of corporal punishment, (2) the relationship between the need and amount of punishment administered, and (3) the extent of the injury inflicted." *Id.* Whether a school employee's use of force was "obviously excessive" is an "objective matter"; we ask whether "the use of force was objectively reasonable," without regard to "the subjective intent of the school official." *See Wilson*, 610 F.3d at 599–600 (citation omitted). Here, because we conclude that Cammon's use of force wasn't obviously excessive, we don't consider whether it "presented a reasonably foreseeable risk of serious bodily injury." *See id.* at 602.

Our decision in *Wilson* is illustrative. There, a fourteen-year-old student named T.W. suffered from "developmental and behavioral problems" and an anxiety disorder. 610 F.3d at 593. He was placed in a class for students with autism. *Id.* at 594. T.W.'s teacher "used physical force" and "restrained" the students when disciplining them. *Id.* In one incident, this teacher (who weighed 300 pounds) "forced T.W. to the floor and pulled his right leg up against the back of his left leg. [The teacher] held T.W. in this position for two to three minutes." *Id.* at 595. In another incident, the teacher "pulled T.W. up from his chair without sliding his chair away from the table, which caused T.W.'s legs to hit the edge of

the table." *Id.* The teacher then "forced T.W. against the table, held his arms behind his back, and placed her weight against his back to hold him in that position. [The teacher] held T.W. in that position for about three minutes, even though T.W. told [the teacher] more than once that she was hurting him." *Id.*

We concluded that, although the teacher's actions were "troubling," T.W.'s substantive due process claim failed as a matter of law. *Id.* at 593. As to the need for corporal punishment, we said that the teacher's use of force was "capable of being construed as an attempt to restore order, maintain discipline, or protect T.W. from self-injurious behavior." *Id.* at 600 (quotation marks omitted). As to the "relationship between the need for the use of force and the amount of force administered," we said that "the amount of force at issue here was not totally unrelated to the need for the use of force." *Id.* at 601. Finally, as to the extent of the child's injuries, "T.W. suffered only minor physical injuries," we explained, even though the teacher's actions "aggravated T.W.'s developmental disability, exacerbated his behavioral problems, and caused symptoms of [posttraumatic] stress disorder." *Id.* We concluded that this discipline "was not so arbitrary and egregious as to support a complaint of a violation of substantive due process." *Id.* at 602.

We reach the same conclusion here. As to the need for the use of force, Cammon saw that Harris was "on the floor screaming and defiant." Another school employee confirmed that Harris "was having a really hard time following instruction[s] and calming down," and was "upset and throwing his chair across the room."

Harris himself told his grandmother that "I was acting bad, I was kicking my book bag across the floor." These circumstances establish that Cammon's use of force was "capable of being construed as an attempt to serve [the] pedagogical objectives" of "restor[ing] order" and "maintain[ing] discipline." *See id.* at 600 (citation and quotation marks omitted).

Next, as to the relationship between the need for the use of force and the amount of force used, "we cannot say that the amount of force at issue here was totally unrelated to a need for punishment." *See Peterson v. Baker*, 504 F.3d 1331, 1337, 1340 (11th Cir. 2007) (concluding there was a relationship between the force used and the need for punishment where a teacher choked a "defiant" student). Harris "defiantly disobeyed" his teacher's instructions leading up to the incident. *See id.* As noted, he was "throwing his chair across the room" and "kicking [his] book bag across the floor." Although the disciplinary measures Cammon resorted to were "inappropriate" and "we do not condone them," we cannot say that these measures were "totally unrelated" to the need for order. *See id.*

Finally, as to the extent of the injuries, this "important factor" weighs heavily against Harris. *See Wilson*, 610 F.3d at 601. Unlike *Wilson*, where the student suffered "minor physical injuries" like "bruises," *id.*, the complaint doesn't allege that Harris suffered any physical injuries. Although Harris told his grandmother that he hit his head when Cammon lifted him, she checked his head "but didn't see any bruises." And there is no allegation that Harris

"received medical treatment for any physical injuries." *See id.* In the absence of physical injuries, we cannot say that Cammon's actions were obviously excessive. *See Peterson*, 504 F.3d at 1337 (concluding that choking a student until he lost his breath and sustained bruises and a scratch on his neck "was not obviously excessive" because "the extent of the student's bodily injury was not serious.").

We are sensitive to the fact that Harris was diagnosed with posttraumatic stress disorder. But even this "psychological injury" and the "symptoms of [posttraumatic] stress disorder" that Harris suffers from don't alter our conclusion "that [Cammon's] conduct was not so arbitrary and egregious as to support a complaint of a violation of substantive due process." *See Wilson*, 610 F.3d at 602.

This case is simply not like those where we've held that corporal punishment was obviously excessive. We have said that destroying a student's eyeball by smashing a heavy metal object into his skull shocks the conscience. *See Neal*, 229 F.3d at 1071 (holding that a student stated an excessive corporal punishment claim where a coach hit him in the head with a "weight lock," knocking his eye "completely out of its socket" and leaving it "destroyed and dismembered."). So does beating a student repeatedly with a metal cane. *See Kirkland ex rel. Jones v. Greene Cnty. Bd. of Educ.*, 347 F.3d 903, 904 (11th Cir. 2003) (affirming denial of qualified immunity where a principal struck a student "with a metal cane in the head, ribs and back, leaving a large knot on his head and causing

him to suffer continuing migraine headaches."). We cannot say the same about briefly suspending a child in the air by his beltloop.

We reiterate that we "do not condone the use of force against a vulnerable student." *See Wilson*, 610 F.3d at 602. But, as we have said, section 1983 does not convert the Due Process Clause of the Fourteenth Amendment into a "font of tort law." *See Lewis*, 523 U.S. at 848. Our decision in this case "comports with the Supreme Court's mandate to remain vigilant in policing the boundaries separating tort law from constitutional law." *Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373, 1379 (11th Cir. 2002). Because "no reasonable jury could conclude that [Cammon's] use of force was obviously excessive in the constitutional sense," we affirm the district court's dismissal of Harris's substantive due process section 1983 claim. *See Wilson*, 610 F.3d at 602.

## IV.    CONCLUSION

We affirm the district court's order dismissing Harris's complaint for failure to state a claim.

**AFFIRMED.**